UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFFREY KOONCE,<br><br>                              Plaintiff,<br><br>     -against-<br><br>CITY OF MOUNT VERNON; COUNTY OF WESTCHESTER; Detective JAMES GARCIA; Detective Lieutenant ROBERT ASTORINO; Detective DANIEL SALOTTOLO; JOHN DOES 1–10; JOHN DOE 11, as Administrator of the Estate of ANTHONY M. MOSCA; and JOHN DOE 12, as supervising officer of the MVPD detective unit;<br><br>                              Defendants. | **26-cv-2310(KMK)**<br><br><br>**FIRST AMENDED COMPLAINT JURY TRIAL DEMANDED** |

Plaintiff Jeffrey Koonce, by and through his attorneys Newirth Linehan PLLC, complaining of the defendants, respectfully alleges, upon information and belief, as follows:

## INTRODUCTION

1.      This civil rights action under 42 U.S.C. §§ 1983 and 1988 and New York law, seeks monetary damages for the Plaintiff, Jeffrey Koonce, due to his unlawful arrest, prosecution, and conviction for robbery and assault in Westchester County; his pretrial detention and post-conviction imprisonment totaling more than eight years plus an additional three years under strict community supervision; and his additional consequential damages.

2.      Beginning in 1981, Jeffrey Koonce was wrongfully arrested, prosecuted for, and convicted of, a robbery and assault that he had nothing to do with: the June 20, 1981, armed robbery of the Vernon Stars Rod & Gun Club in Mount Vernon, New York during which two people were wounded (the "Vernon Stars Robbery"). Mr. Koonce's wrongful arrest, prosecution, and conviction were a result of the misconduct, detailed below, by members of

1

the Mount Vernon Police Department ("MVPD") and the Westchester County District Attorney's Office ("WCDA").

3.      At the time of the crime, Mr. Koonce was in New Rochelle and Manhattan, miles from the scene. Mr. Koonce's alibi was corroborated by multiple witnesses, including two independent witnesses who had no personal connection to Mr. Koonce.

4.      Mr. Koonce did not match the descriptions of the perpetrators given by multiple eyewitnesses on the night of the robbery. He had no connection to the city of Mount Vernon or the Vernon Stars Rod & Gun Club. And he was recovering from a serious injury that would have also made it physically impossible for him to commit the crime in the manner alleged.

5.      Despite the obviousness of Mr. Koonce's innocence, he was nevertheless arrested, prosecuted, and wrongfully convicted of the robbery based on fabricated eyewitness evidence procured by corrupt Mount Vernon Police Department detectives through a series of unconstitutionally suggestive procedures designed to obtain false identifications and ensure Mr. Koonce's wrongful conviction.

6.      The lead detective in Mr. Koonce's case, Defendant Detective James Garcia, and his supervisor in this and other investigators, Defendant Detective Lieutenant Robert Astorino, were corrupt officers of the MVPD, a police department with a decades long history of corruption and misconduct, which has continued to the present due to a lack of training, oversight, supervision, and discipline. In 1994, Defendants Garcia and Astorino pleaded guilty to federal corruption charges stemming from crimes committed in the line of duty.

7.      Garcia, Astornio, and another MVPD officer, Defendant Detective Daniel Salottolo fabricated evidence against Mr. Koonce using deeply flawed and unconstitutional procedures. They included Mr. Koonce's photograph in a photographic array despite having no reason to suspect Mr. Koonce committed the crime. They altered Mr. Koonce's photograph to make it stand out from the other photographs in the array. They improperly coached and

2

prompted a vulnerable witness to make an identification from this manipulated array. Once they obtained a positive identification under these conditions, the detectives conducted an impermissibly suggestive one-on-one showup—at the direction of the WCDA—despite there being no exigency whatsoever. At the showup, Defendants Garcia and Salottolo once again primed the same vulnerable witness to make another positive identification of Mr. Koonce by telling him the person he was about to see was the individual he had already identified. Defendants Garcia and Salottolo then presented Mr. Koonce to the witness in visible handcuffs. This combination of improper and unduly suggestive elements led the witness to again identify Mr. Koonce, despite having no independent basis for doing so.

8.      To bolster the weak case against Mr. Koonce, Garcia and Salottolo used improper methods to obtain a false statement implicating Mr. Koonce from an incentivized informant who was under arrest at the time of his interview, but was released after providing the inculpatory statement.  Defendants Garcia and Salottolo provided the incentivized informant with non-public details about the crime in order to bolster the false statement's credibility.

9.      The detectives concealed their misconduct from the prosecution, the grand jury, the court, and the defense. They hid that there was no basis to include Mr. Koonce in the photo array; the true circumstances of both the identification procedures and the interview of the incentivized informant that led to his statement implicating Mr. Koonce. They provided none of this exculpatory and impeachment evidence to the prosecution or the defense.

10.     Mr. Koonce was prosecuted by the WCDA, an office with its own documented history of misconduct and an absence of training, supervision, and discipline of its attorneys. At Mr. Koonce's trial, the trial prosecutor suppressed *Brady* material and engaged in summation and other trial misconduct, including knowingly eliciting and failing to correct false police testimony offered by Defendant Salottolo.

11.     As a result of this misconduct, and despite the absence of any reliable evidence connecting Mr. Koonce to the crime, he was convicted of Robbery in the First Degree, Robbery in the Second Degree, and Assault in the First Degree, and sentenced to an indeterminate term of 7 ½ to 15 years in prison. Following his conviction, he served approximately eight years in New York's most dangerous prisons before being released. He was also detained pretrial, and subject to three years' strict post-release supervision.

12.     For more than four decades after his arrest, Mr. Koonce carried the stigma of a violent felony conviction, losing educational opportunities, an entire professional career, employment, and family relationships.

13.     In 2024, the WCDAs Conviction Review Unit reinvestigated Mr. Koonce's conviction and joined Mr. Koonce's motion to vacate his conviction, then moving to dismiss the indictment.

14.     On December 27, 2024, the Westchester County Court vacated Mr. Koonce's conviction and dismissed the indictment. *See* Exhibit A.

15.     Mr. Koonce's wrongful arrest, prosecution, and conviction are not merely the result of the misconduct of individual actors. Rather, they are the direct and foreseeable consequences of MVPD's and WCDA's policies and practices, and deliberate indifference to the rights of criminal defendants.

16.     Through this civil rights action, Mr. Koonce seeks to hold Defendants accountable for the fabrication of evidence, the suppression of exculpatory material, the conspiracy to deprive him of his constitutional rights, and the systemic policies and practices that permitted and encouraged such misconduct.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

17.     This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988 and under the common law of the State of New York.

18.     The acts and omissions giving rise to this complaint occurred in Westchester County.

19.     This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 and 1343, as this action seeks redress for the violation of Plaintiff's constitutional and civil rights.

20.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a), as Plaintiff's state law claims form part of the same case or controversy as the federal claims.

21.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b), as this is the judicial district in which events giving rise to Plaintiff's claims took place.

22.     This action has been commenced within the applicable period for each claim.

23.     Plaintiff served a timely Notice of Claim on the City of Mount Vernon and the County of Westchester on or about March 14, 2025, in compliance with General Municipal Law § 50-e.

24.     Plaintiff submitted to an examination pursuant to General Municipal Law § 50-h on July 10, 2025.

25.     More than 90 days have elapsed since Mr. Koonce's submission of his notices of claim and 50-h hearing. Plaintiff has complied with all conditions precedent to suit set forth in General Municipal Law § 50-i.

**JURY DEMAND**

26.     Pursuant to the Seventh Amendment to the United States Constitution and Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury on all issues so triable.

**PARTIES**

27.     Plaintiff Jeffrey Koonce is a sixty-eight-year-old African American resident of Peekskill, New York. He is and was at all times relevant to this Complaint a citizen of the United States and a domiciliary and resident of the State of New York.

28.     Defendant James Garcia ("Garcia") was at all times relevant to this Complaint a detective employed by the MVPD. Garcia is sued in his individual and official capacities.

29.     Defendant Robert Astorino ("Astorino") was at all times relevant to this Complaint a detective lieutenant employed by the MVPD. Astorino was the Commanding Officer of the Detective Bureau of the MVPD and participated in, and supervised, the investigation of the Vernon Stars Robbery. Astorino is sued in his individual and official capacities.

30.     Defendant Daniel Salottolo ("Salottolo") was at all times relevant to this Complaint a detective employed by the MVPD. Salottolo is sued in his individual and official capacities.

31.     Defendants John Does 1–10 are presently unidentified officers of the MVPD who participated in or contributed to the deprivation of Mr. Koonce's constitutional rights. The John Doe Defendants are sued in their individual and official capacities.

32.     Defendant John Doe 11 is the administrator of the estate of Anthony M. Mosca ("Mosca"), who is now deceased. Mosca was, at all times relevant to this Complaint, the Chief of Police and/or Commissioner of the MVPD and was the final supervisory authority over the MVPD, including over the detective division that investigated Mr. Koonce's case. Mosca is sued through the administrator of his estate, in Mosca's individual and official capacities. For ease of reference, the administrator is referred to throughout this Complaint as "Mosca."

33.     Defendant John Doe 12 is a fictitious name for the presently unidentified direct supervisor of Defendant Astorino within the MVPD. John Doe 12 is sued in his individual and official capacities.

34.     Defendant City of Mount Vernon (the "City") is a municipal corporation organized under the laws of the State of New York. At all times relevant to this Complaint, the City was the employer of Defendants Garcia, Salottolo, Astorino, Mosca, John Doe 12, and the John Doe Defendants.

35.     Defendant County of Westchester (the "County") is a municipal corporation organized under the laws of the State of New York. At all times relevant to this Complaint, the County was the employer of the assistant district attorneys in the WCDA who prosecuted Mr. Koonce.

<b>ALLEGATIONS COMMON TO ALL CAUSES OF ACTION</b>

**A.     JEFFREY KOONCE IS INNOCENT OF THE VERNON STARS ROBBERY AND RELATED ASSAULT**

36.     Jeffrey Koonce was born in the Bronx, New York, and raised in the Wakefield section of the Bronx in the Edenwald Houses public housing development. He graduated from DeWitt Clinton High School and served in the United States Army.

37.     In 1979, Mr. Koonce enrolled at Mercy College in Dobbs Ferry, New York, where he studied criminal justice full-time. His goal was to work in probation or parole services to help at-risk youth and others from his community.

38.     At the time of the robbery for which he would be wrongfully convicted, Mr. Koonce was a full-time college student and working as an exterminator for Jones Pest Control in New Rochelle. He was also the primary caregiver for his six-year-old son. He and his then-girlfriend, Nadine Robinson, were expecting a baby girl.

39.     Mr. Koonce was twenty-four years old at the time of his arrest. Just four months before the robbery, in February 1981, he had been shot multiple times in an unrelated incident, suffering wounds to his leg, back, and knee that left him in a coma for nearly two weeks. He was still recovering from these injuries at the time of the robbery on June 20, 1981 and, as a

result, would have been physically unable to carry and shoot a shotgun, as alleged by the police and prosecution.

40. On the evening and night of June 20, 1981, into the early morning hours of June 21, 1981, Mr. Koonce was socializing in front of his apartment building in New Rochelle, New York. Shortly before midnight, Mr. Koonce and several neighbors went to Manhattan and returned to New Rochelle after two o'clock in the morning. At no time on June 20-21, 1981, did Mr. Koonce go to Mount Vernon, New York. Mr. Koonce had nothing to do with the Vernon Stars Robbery.

**B. THE ARMED ROBBERY OF THE VERNON STARS ROD & GUN CLUB**

41. On or about June 20, 1981, at approximately 12:20 a.m., an armed man and two other men entered the Vernon Stars Rod & Gun Club, a social club located at 33 East Third Street in Mount Vernon, New York.

42. The three perpetrators announced a robbery, with the armed man immediately shooting out the sole source of light in the room. Approximately twenty to thirty patrons were present; they were ordered to lie down on the floor and not look at the robbers. They complied. During the robbery, one of the robbers shot a fifteen-year-old boy, Charles Shuler, in the arm.

43. Although Shuler did not see the shooter's face, he became the sole eyewitness whose identification was used to prosecute Mr. Koonce.

44. Responding MVPD officers documented the eyewitnesses' descriptions of the perpetrators: three African America males; aged 17-18 years old. One was described as 5'9'', slim, approximately 135 lbs, wearing a red short sleeved shirt and carrying a sawed off shotgun. The second suspect was described as 5'7'', slim, wearing dark clothes and carrying a 38-caliber handgun. The third suspect was described as having short hair, wearing blue and a hat, with medium sideburns and a husky build.

8

45. MVPD Detectives Defendants Garcia and Salottolo were assigned to investigate the robbery. Defendant Astorino supervised the investigation.

## C. MR. KOONCE DID NOT MATCH THE DESCRIPTIONS OF THE PERPETRATORS AND WAS NOT IN MOUNT VERNON AT THE TIME OF THE CRIME

46. Mr. Koonce did not match the descriptions provided by the eyewitnesses. Most significantly, while the perpetrators were described as 17-18 years old, Mr. Koonce was twenty-four years old. He was not slim and did not have sideburns. No eyewitness on the night of the robbery described a perpetrator matching Mr. Koonce's appearance.

47. On the night of the crime, Mr. Koonce was at his home at 331 Huguenot Avenue in New Rochelle, New York, where he lived with his then-girlfriend, Nadine Robinson.

48. Mr. Koonce spent the evening of the crime socializing with his younger brother Paul in front of his Huguenot Avenue apartment building. Other neighbors, including Samuel Guest, his girlfriend Brenda Johnson, and the building superintendent, Robert Pryor, were also in front of the building.

49. Around midnight, after Paul left for work, Mr. Koonce asked Mr. Guest to drive him to Manhattan because Mr. Koonce's car was not operational. Mr. Koonce offered Mr. Guest gas money, and Mr. Guest agreed.

50. Around midnight, Mr. Guest drove Mr. Koonce, Ms. Johnson, and Mr. Pryor to Manhattan; the three returned to New Rochelle, stopping at a White Castle in the Bronx on the way back. They returned home around 2:30 a.m., when Mr. Koonce returned to his apartment and went to sleep.

51. At no point on the night of June 20, 1981 did Mr. Koonce go to Mount Vernon.

## D. RATHER THAN INVESTIGATE, MVPD DETECTIVES TROLL FOR SUSPECTS IN THE BRONX

52. The police took no investigative steps to identify the true perpetrators of the robbery.

53.    Instead, on June 22, 1981, Defendants Garcia and Salottolo took witnesses to the New York City Police Department's 47th Precinct to look at mugshot photographs. The 47th Precinct is a New York City Police Department Precinct located just over the Westchester border in the Bronx. There was no evidence or investigatory lead on June 22, 1981—or at any other time—to suggest that the perpetrators had any connection to the Bronx.

54.    The witnesses did not identify anyone portrayed in the mugshots as a perpetrator of the crime.

55.    Defendants Garcia and Salottolo then drove the witnesses through the Edenwald Houses, a large, predominantly African American housing project in the Bronx. According to Salottolo, the purpose of this was to see if the perpetrators might be on the street. There was no evidence on June 22, 1981—or at any other time—to suggest that the perpetrators had any connection to the Edenwald Houses.  The witnesses did not recognize anyone in the Edenwald Houses from the robbery.

56.    Defendant Salottolo testified that at some point after June 22, 1981 and before June 30, 1981, he and Defendant Garcia obtained a polaroid photograph of Mr. Koonce from the NYPD.

57.    There is no documented basis in the police investigative file explaining how or why the police obtained a photograph of Mr. Koonce. No tip sheet, informant report, witness statement, or other contemporaneous document explains how Mr. Koonce's name first came to the attention of the investigating detectives, or how, when or why Defendants Garcia and Salottolo obtained the photograph.

58.    Mr. Koonce lived in New Rochelle, not Mount Vernon. He was not a known associate of any individual connected to the Vernon Stars Rod & Gun Club. There was no physical evidence, forensic evidence, or prior intelligence linking him to the crime.

59. At the time of his arrest, Mr. Koonce was a full-time student at Mercy College studying criminal justice and working as an exterminator. He had no prior convictions for armed robbery or any violent offense.

**E.    DEFENDANTS MANIPULATE MR. KOONCE'S PHOTOGRAPH AND CREATE A SUGGESTIVE PHOTOGRAPHIC ARRAY BIASED AGAINST MR. KOONCE**

60. After obtaining the Polaroid photograph of Mr. Koonce from the NYPD, Defendant Salottolo and/or Defendant Garcia directed the NYPD to enlarge the photograph. Defendants Salottolo and/or Garcia placed the enlarged photograph of Mr. Koonce, together with five other photographs, into a photographic array:





61. Mr. Koonce's photograph, in position four, is the largest and darkest of all photographs, making it stand out from the other photographs.

11

62.     Mr. Koonce's photograph is also the only polaroid photograph contained in the array, and, unlike three of the other photographs, is not a traditional mugshot with both a front-facing and profile view.

63.     Detective Salottolo testified falsely that the other photographs in the array were selected based on their similarity to Mr. Koonce. In fact, the other photographs bore little resemblance to Mr. Koonce and did not match the descriptions of the perpetrators. Detective Salottolo also testified that the other photographs were either on file at MVPD headquarters or in his office.

64.     Information suppressed by MVPD and WCDA until 2024 revealed that all but one of the other individuals in the array had prior armed robbery convictions. (One individual could not be identified.) They were thus selected based on these prior convictions, not based on their resemblance to Mr. Koonce—who was not a suspect at the time the array was created. Also revealed for the first time in 2024 is the fact that one of the photographs was of Mr. Koonce's older brother Dudley, seven years his senior, who had prior armed robbery convictions.

65.     Finally, it was revealed for the first time in 2024 that only one photograph—that of the unidentified person—came from MVPD.  The rest came from other law enforcement agencies.

66.     The true composition and construction of the photographic array—including that it was designed to make Mr. Koonce's photograph stand out, that the fillers were not selected based on resemblance, that the photographs were obtained from other law enforcement agencies, and that four of the other known lineup members had a documented history of armed robbery—was material exculpatory and impeachment information that the detectives suppressed from the prosecution and the defense.

**F.      DEFENDANTS PRESENT THE MANIPULATED AND SUGGESTIVE ARRAY TO SHULER, A WITNESS WITH NO BASIS TO MAKE AN**

**IDENTIFICATION, AND USE SUGGESTIVE AND COERCIVE
PROMPTS TO ENSURE HE MAKES A POSITIVE IDENTIFICATION**

67. As of June 30, 1981, Defendants Garcia and Salottolo knew:

(a) Mr. Koonce did not match the description of any perpetrator and was inconsistent in appearance with the descriptions in every material respect;

(b) Mr. Koonce had no connection to Mount Vernon;

(c) Mr. Koonce had no history of armed robbery or other violent crime;

(d) No evidence connected Mr. Koonce to the crime; and

(e) Shuler did not see the perpetrators' faces.

68. Nevertheless, Defendants Garcia and Salottolo presented the manipulated and suggestive array to Shuler.

69. On June 30, 1981, Defendants Garcia and Salottolo brought the photo array to the Mount Vernon Hospital, where Shuler was recovering from the shotgun wound to the arm he sustained during the Vernon Stars robbery.

70. Shuler was lying in bed, appeared to be in pain, and his arm was immobilized. His injuries were not life-threatening.

71. Shuler was unable to hold the array due to his injury, so Defendant Garcia or Defendant Salottolo held the array in front of him. Shuler was shown only the first page of the two-page array—effectively reducing the size of the lineup from six to four, with Mr. Koonce in the last position. This further increased the chance that Mr. Koonce would be selected by the witness.

72. Defendant Garcia and/or Salottolo provided Mr. Shuler with suggestive pre-procedure instructions, telling him at least twice, in substance, to identify the shooter from the array. This suggestive instruction makes the witness believe that the perpetrator is, in fact, in the array and increases the likelihood that the witness will make an identification, whether or not the perpetrator is actually present.

73. After viewing the suggestive photo array for several minutes, and being improperly prompted by Garcia and/or Salottolo, Shuler selected Mr. Koonce's photograph.

74. Three other eyewitnesses failed to identify Koonce as the perpetrator. These non-identifications were not documented by Defendants Garcia, Salottolo, or Astorino, who supervised Defendants Garcia and Salottolo. The rejections by other eyewitnesses were first disclosed at Mr. Koonce's pretrial suppression hearing. No contemporaneous record was made of these lineup rejections, or any other interactions with the eyewitnesses on the days they were shown the photo array.

75. To the contrary, the police reports created in the case were misleading by omission: they documented Shuler's purported "identification" of Mr. Koonce as a valid one, while omitting (a) the improper and suggestive manner in which it was manufactured, and (b) the three other eyewitnesses' failure to identify Mr. Koonce as the perpetrator.

### G. DEFENDANTS ARREST MR. KOONCE AND ENSURE A SECOND POSITIVE IDENTIFICATION THROUGH AN IMPERMISSIBLY SUGGESTIVE PROCEDURE AND COERCIVE PROMPTING

76. Detectives Garcia and Salottolo took no investigative steps to assess the accuracy of Mr. Shuler's identification or investigate the substantial evidence supporting Mr. Koonce's claim of innocence.

77. Instead, Detectives Garcia and Salottolo decided, despite all evidence pointing away from Mr. Koonce, to arrest Mr. Koonce for the Vernon Stars armed robbery and Shuler shooting and ensure he would be convicted by fabricating inculpatory evidence and suppressing exculpatory evidence.

78. Detectives Garcia and Salottolo began looking for Mr. Koonce. They or other law enforcement officers went to his Huguenot Street apartment, but he was not home. When Mr. Koonce arrived home and learned that police had been looking for him, he immediately called the New Rochelle Police Department and identified himself and the reason for his call.

In response to questioning, Mr. Koonce provided his home address and agreed to wait there for police.

79.     Soon thereafter, Defendants Garcia and Salottolo arrived at his apartment and told Mr. Koonce he was under arrest. He had no idea why he was being arrested.

80.     There was no probable cause to arrest Mr. Koonce, because, as Defendants Garcia and Salottolo knew, Mr. Shuler had no independent basis to identify the perpetrator and his identification of Mr. Koonce was the product of Garcia and Salottolo's distortion, manipulation, suggestion, and coercion.

81.     Defendant Garcia and Defendant Salottolo did not provide Mr. Koonce with *Miranda* warnings, as required.

82.     Defendant Garcia and Defendant Salottolo handcuffed Mr. Koonce and placed him in the back of their car. Defendants Garcia and Salottolo then drove Mr. Koonce around while questioning him.

83.     Assistant District Attorney James H. O'Brien, the head of the Westchester District Attorney's Mount Vernon Office, directed and/or authorized Defendants Garcia and Salottolo to bring Mr. Koonce to the Mount Vernon Hospital to conduct a one-on-one showup with Charles Shuler, or approved of this conduct in advance. This showup was conducted despite no exigent circumstances, contrary to then-settled law.

84.     Before Defendants Garcia and Salottolo presented Mr. Koonce to Mr. Shuler at the hospital, Defendants Garcia and Salottolo told Mr. Shuler that the person he was about to see was the individual he had already identified from the photographic array. This statement was another act of impermissible suggestion designed to ensure Mr. Shuler would again identify Mr. Koonce.

85.     Mr. Koonce was presented to Mr. Shuler while visibly handcuffed. He was the only person presented to Mr. Shuler.

15

86.     The one-on-one hospital showup was inherently suggestive. Mr. Koonce was the only individual presented to Shuler. The procedure left no room for Shuler to exercise independent judgment—he was being asked simply to confirm a prior identification that had itself been procured through a suggestive array.

87.     The one-on-one hospital showup was also unnecessary. Mr. Shuler's life was not in danger. Other eyewitnesses were available to view a live lineup.

88.     Shuler identified Mr. Koonce at the hospital showup. The circumstances of the showup—including the suggestive pre-procedure remarks—were material exculpatory and impeachment information that the detectives failed to disclose fully and accurately to the prosecution and the defense.

**H.     DEFENDANTS GARCIA AND SALOTTOLO FABRICATE ADDITIONAL EVIDENCE TO ENSURE MR. KOONCE IS WRONGLY CONVICTED**

89.     Defendant Garcia falsified a sworn search warrant application for a blue tote bag with white handles at Mr. Koonce's apartment, by falsely representing that a blue tote bag with white handles was seen at Mr. Koonce's apartment at the time of Mr. Koonce's arrest on June 30, 1981.

90.     There was no blue tote bag with white handles at Mr. Koonce's apartment on June 30, 1981.

91.     Defendant Garcia obtained a search warrant for Mr. Koonce's apartment based on his false representation.

92.     Defendant Garcia claimed he executed the search warrant at Mr. Koonce's apartment and obtained a blue tote bag with white handles, which was later admitted in evidence at Mr. Koonce's trial.  This bag was not obtained from Mr. Koonce's apartment, as Defendant Garcia falsely represented on July 6, 1981, in his sworn search warrant inventory.

93.    On July 1, 1981, while Mr. Koonce was in custody, Mr. Koonce's girlfriend, Nadine Robinson, reported to the New Rochelle Police Department that a person had broken into the Huguenot Street apartment that she shared with Mr. Koonce. According to Ms. Robinson, various items, including a black duffle bag, had been stolen. Ms. Robinson stated that she suspected Ronald Deighan.

94.    Ronald Deighan was the boyfriend of Ms. Robinson's friend. When Deighan and his girlfriend became homeless months before these events, Ms. Robinson invited them to stay at the Huguenot Street apartment with her and Mr. Koonce for a time.

95.    While investigating Ms. Robinson's complaint, the New Rochelle Police Department interviewed a witness who provided a sworn statement reporting that she saw Mr. Deighan near the Huguenot Street apartment building carrying a full, black duffel bag that matched the one Ms. Robinson reported being stolen.

96.    On July 2, 1981, the New Rochelle Police Department confronted Mr. Deighan at the Huguenot Street apartment building, arrested him, and transported him to the New Rochelle Police Department. Deighan was interviewed by investigating officers.

97.    That same day, at the New Rochelle Police Department, Deighan was interviewed by Defendants Garcia and Salottolo. Deighan gave a statement implicating Mr. Koonce and his teenage brother Paul in the Vernon Stars robbery.

98.    Deighan's statement contained objectively false information, including that Mr. Koonce drove his own car on the night of the crime (the car was not operational) and Mr. Deighan had been with Mr. Koonce and his brother Paul that night, at the time Mr. Koonce was with neighbors and Paul was at work in the Bronx. Deighan's statement also included non-public facts about the robbery that were known to Defendants Garcia and Salottolo, which the detectives fed to Deighan to include in his statement.

99.    Deighan's statement was false in its entirety. It was the product of suggestion, coercion, and/or fabrication by Defendants Garcia and Salottolo, and was provided by Deighan to evade prosecution for the burglary of Ms. Robinson and Mr. Koonce's apartment.

100.    Deighan was released from custody after providing the statement and never prosecuted for the burglary of Ms. Robinson and Mr. Koonce's Huguenot Street apartment.

101.    Deighan also never testified against Mr. Koonce, despite being sought as a witness by WCDA. Deighan fled the area prior to Mr. Koonce's trial.

102.    The circumstances surrounding Deighan's statement—including Ms. Robinson's burglary complaint and Deighan's subsequent arrest, Deighan's motive to cooperate, Deighan's prior criminal history and connections to law enforcement, and that detectives fed him information—constituted material impeachment evidence that the detectives suppressed from the prosecution and the defense.

103.    Deighan is now deceased and cannot be questioned about the circumstances under which his statement was obtained.

## I.    DEFENDANTS' MISLEADING PRESENTATION TO WCDA, AND THE WCDA'S MISLEADING GRAND JURY PRESENTATION

104.    Upon information and belief, Garcia, Salottolo, and Astorino, independently or collectively, forwarded or caused to be forwarded their misleading police reports to the WCDA to convince that office to formally charge Mr. Koonce with the Vernon Stars Robbery.

105.    Garcia, Salottolo, and Astorino also met with prosecutors prior to the grand jury presentation and confirmed the information contained in the reports.

106.    At no time prior to Mr. Koonce's indictment did Garcia, Salottolo, and Astorino disclose to WCDA, including ADA O'Brien, their fabrication of evidence, including the Shuler "identification" of Mr. Koonce, or the three eyewitnesses' failure to identify Mr. Koonce.

107. Garcia, Salottolo, and Astorino, acting in concert in with others, caused a blatantly false felony complaint report alleging Mr. Koonce committed the Vernon Stars robbery to be prepared and forwarded to the WCDA.

108. On July 6, 1981, the WCDA conducted a felony hearing in Shuler's hospital room, at which Mr. Koonce, his brother Paul and a third, unidentified man, were presented to Shuler. Shuler was asked if he recognized anyone and he indicated Mr. Koonce. As a direct result of the earlier, impermissible tactics the detectives used to cause Shuler to falsely identify Mr. Koonce, Shuler once again identified Mr. Koonce.

109. On July 13, 1981, Defendants Garcia, Salottolo, and Astorino conducted an in-person lineup featuring Paul Koonce in the presence of a defense attorney. After looking at the lineup for 10-15 minutes, the witness did not identify any lineup member as participating in the Vernon Stars robbery. Once the defense attorney left, the witness purportedly told Astorino that he recognized Paul Koonce as one of the perpetrators. On information and belief, this identification was the product of Astorino's suggestion, prompting, and/or coercion.

110. In August 1981, the WCDA presented Jeffrey Koonce's case to a grand jury through a false, misleading, and incomplete grand jury presentation.

111. The prosecutor presenting Mr. Koonce's case did not inform the grand jury of:

(a)    The police misconduct in compiling the photo array;

(b)    The true circumstances surrounding Shuler's first "identification" of Mr. Koonce, including the prompting of Shuler;

(c)    That Garcia and Salottolo told Mr. Shuler, at the hospital showup, that the person he was about to see was the individual he had already identified from the photographic array;

(d)    The falsity of the search warrant affidavit;

(e)    Defendant Garcia's false search warrant inventory;

(f)    The falsity of Ronald Deighan's statement implicating Mr. Koonce and the fact that Defendants Garcia and Salottolo provided Deighan with nonpublic facts which were incorporated in his false statement;

112.    The grand jury, unaware of the above exculpatory and impeaching evidence, returned an indictment charging Mr. Koonce with the robbery.

**J.    MR. KOONCE IS DENIED A FAIR TRIAL**

113.    Mr. Koonce was indicted by a Westchester County grand jury and tried before a jury in Westchester County Court. Mr. Koonce was tried jointly with his teenage brother, Paul, who was arrested in September 1981 at his high school in the Bronx.

114.    The defense challenged the hospital showup procedure at a pretrial *Wade* hearing. The court held that the procedure was unconstitutionally suggestive and suppressed the resulting identification. However, and despite Shuler's testimony at the hearing that he had been sleeping at the time the robbers entered the Vernon Stars club and that Defendants Garcia and Salottolo had improperly primed him to identify Mr. Koonce, the Court ruled that Shuler had an "independent source" for a future in court identification, which would be allowed.

115.    At the time the court made its "independent source" determination, the court was unaware of defendants' misconduct in securing Shuler's photographic identification of Mr. Koonce, misconduct that would have led the court to find there was no independent basis for Shuler's in-court identification.

116.    At trial, the prosecution's case rested entirely on Shuler's identification of Mr. Koonce.

117.    Mr. Shuler made a positive in-court identification of Mr. Koonce as the shooter.

118.    During the pretrial hearings and/or at trial, Defendant Salottolo provided materially false testimony, including:

(a)    MVPD received information prior to June 30, 1981 implicating Mr. Koonce in the Vernon Stars Robbery;

(b)    Mr. Koonce was provided *Miranda* warnings at the time of his arrest;

(c)    The photo array was composed by selecting five "filler" photographs similar in appearance to Mr. Koonce, who was the police suspect as of June 30, 1981;

(d)    The blue tote bag was recovered from Mr. Koonce's apartment;

(e)    He and/or others investigated Mr. Koonce's alibi and determined it was not believable—when in fact they did not investigate Mr. Koonce's alibi at all.

119.    By the time of trial, the assigned ADA,  Mary Smith, knew, or at the very least, should have known based on her interview of the trial witnesses and other police reports, that this testimony was false.

120.    Nevertheless, the prosecution knowingly elicited and failed to correct Detective Salottolo's false testimony and failed to disclose to the defense the *Brady* and *Giglio* material necessary to confront his false testimony.

121.    Mr. Koonce presented a defense of innocence. He testified in his own defense and called alibi witnesses Samuel Guest and Robert Pryor. Paul Koonce also testified in his own defense.

122.    Mr. Guest and Mr. Pryor both testified that they did not have any personal relationship with Mr. Koonce. Mr. Guest was staying with a relative in the Huguenot Street apartment building and Mr. Pryor was the building's superintendent. Each man described how, on the night of June 20, 1981, they saw Mr. Koonce in front of the building, and that Mr. Koonce asked for a ride to Manhattan. Mr. Guest agreed, on the condition that Mr. Koonce give Mr. Guest gas money. Mr. Koonce, Mr. Guest, and Mr. Pryor, along with Mr. Guest's girlfriend, left New Rochelle around midnight, drove to Manhattan, and returned to New

Rochelle around 2:30 am, after having stopped to eat at a White Castle. Mr. Koonce testified consistent with this account. Paul Koonce testified he was with his brother at the Huguenot Street apartment building earlier in the night, and left to go to work in the Bronx.

123.    During summation, ADA Smith engaged in pervasive misconduct that denied Mr. Koonce a fair trial. The misconduct included racially and socioeconomically prejudicial statements, inflammatory appeals to fear, personal vouching for witness credibility, assertions of facts not in evidence, improper burden-shifting comments, and civic duty arguments—a pattern that both defense attorneys contemporaneously challenged through objections and a post-summation mistrial motion.

124.    The prosecutor made racially and socioeconomically prejudicial statements designed to appeal to bias rather than evidence. She described the Vernon Stars as "a dump" "in a [B]lack neighborhood," asked the all-white jury "Would you want to go there?," and characterized the witnesses (including the prosecution's own witnesses) and victims as people who "are not people who might go to the theater or the ballet" but who "live on the street" and "live by their wits" in "a world that is different than you and I." These statements invited the all-white jury to view the case through a lens of racial and class prejudice. ADA Smith made these arguments despite all of the witnesses, victims, and defendants being students, professionals, military veterans, and/or employed full-time.

125.    The prosecutor advanced a race-based theory of identification reliability without any evidentiary basis. She told the jury that "within your own social and racial groups there are certain characteristics that you became very familiar with," that "all of the people in this case are black" and "are of the same social milieu," and that therefore they "do not have to overcome the hurdles we have to overcome to identify someone." No expert testimony or other evidence supported this argument. Defense counsel identified this as improper in the post-summation mistrial motion.

126.    The prosecutor made repeated inflammatory appeals designed to arouse the jury's emotions rather than their reason. She told the jury it was "a terrifying prospect looking down two holes of sawed-off shotgun which are blasted at you" and that it was "like facing death," repeatedly told the jury the victim "believed he was going to be killed" and was "looking at his death, his possible death," and asked the jurors, "Have you ever been face to face with someone you thought was going to kill you?"

127.    The prosecutor personally vouched for witness credibility, telling the jury that even though the witnesses were "afraid," "does that mean they don't know? No, that doesn't mean that," and stating of Shuler, "Is Charles honest? I think and I submit to you he is."

128.    The prosecutor also asserted facts not in evidence, characterizing Mr. Pryor as "blitzed that night" and stating of Mr. Koonce, Mr. Pryor, Mr. Guest, and his girlfriend, "I bet they all were smoking reefer."

129.    The prosecutor further made improper comments on Paul Koonce's exercise of his right to remain silent, calling him a liar twice, mocking his alibi, without any evidentiary basis, as a "recent fabrication" and asserting he should have volunteered an alibi to police. Although directed at Paul Koonce, these comments were made before the same jury trying Jeffrey Koonce, and their prejudicial effect infected the fairness of the entire proceeding. As a result Mr. Koonce's attorney moved for a mistrial post-summation based on these comments.

130.    The prosecutor made improper golden rule and civic duty arguments. She asked the jury "who is going to protect them? Are you going to?" — inviting jurors to place themselves in the witnesses' position. She told the jury it would be "very easy" to decide "why should we bother to consider this case seriously for people in this social club" but that "this is still a society based on law, on justice, and we all have an interest that this doesn't happen to anyone" — an improper civic duty argument inviting conviction to serve societal purposes rather than based on proof beyond a reasonable doubt.

23

131.    The prosecutor dismissed the significance of multiple eyewitnesses who failed to identify the defendants by speculating, without any evidentiary basis, about hypothetical reasons for the non-identifications — asking the jury whether the non-identifying witnesses might have been "blind in one eye" or "drunk" or "scared out of their minds."

132.    Following the summation, both defense attorneys moved for a mistrial, cataloguing the prosecutor's misconduct and identifying it as a cumulative denial of the defendants' right to a fair trial.

133.    The trial court denied the mistrial motions but sustained objections during the summation itself, and the court's own charge to the jury included cautionary instructions — an implicit acknowledgment that the prosecutor had exceeded the bounds of proper advocacy.

### K.    MR. KOONCE'S WRONGFUL CONVICTION, IMPRISONMENT, AND DECADES BRANDED AS A FELON

134.    On May 19, 1983, Mr. Koonce was convicted, and on June 13, 1984, he was sentenced to 7 ½ to 15 years in prison. He served approximately eight years in New York State prison before being released in 1992. He was released to strict parole supervision, which lasted for three years and involved in person reporting and a curfew.

135.    During his incarceration, Mr. Koonce experienced violence, deprivation, and trauma. He was beaten by corrections officers and fellow prisoners, sexually assaulted, and sustained serious injuries to his eye, ankle, shoulder and back that have had lifelong consequences. He was entirely unprotected from other inmates and endured dehumanizing conditions of New York State prisons, including constant fear for his physical safety.

136.    Upon his release, Mr. Koonce carried the permanent stigma of a violent felony conviction. He was fired from multiple jobs when employers discovered his criminal record and denied other jobs for the same reason.

137.    Mr. Koonce's wrongful conviction destroyed his educational and career aspirations. At the time of his arrest, he was a full-time student at Mercy College studying

criminal justice, with the goal of becoming a parole officer to help urban youth. He never completed his degree. The career he envisioned—one devoted to public service—was taken from him. Instead, he spent decades working low-wage jobs and operating a one-man pest control business from a van, with every dollar going to support his children's education.

138. Mr. Koonce suffers from emotional damages as a direct result of his wrongful conviction and incarceration.

139. The wrongful conviction devastated Mr. Koonce's family relationships. His daughter, born in August 1981—just weeks after his arrest—was placed in foster care as a direct consequence of his incarceration. A local newspaper branded Mr. Koonce "most feared," compounding the stigma his family endured.

140. For more than four decades, Mr. Koonce lived under the shadow of a violent felony conviction for a crime he did not commit. The conviction affected every aspect of his life: his career, his employment, his housing, his relationships, and his physical and mental health.

### L. WCDA REINVESTIGATES MR. KOONCE'S CONVICTION AND AGREES TO VACATE IT

141. In November 2020, a new Westchester DA, Mimi Roach, was elected. Upon taking office, she formed a Conviction Review Unit ("CRU"). In 2024, the CRU began to reinvestigate Mr. Koonce's case.

142. That reinvestigation led WCDA to agree to the vacatur of Mr. Koonce's conviction, based on newly discovered evidence. Specifically, WCDA concluded that Salottolo provided false testimony when he testified that the photo array was composed of Mr. Koonce's photograph and five others, selected based on their match to Mr. Koonce. In fact, WCDA concluded that the other lineup members were in fact potential suspects due to their history of similar robberies, which history was suppressed from Mr. Koonce.

143.    Additionally, the WCDA concluded that new information concerning Defendant Garcia's credibility—including but not limited to the federal investigation, prosecution, and conviction—undermined confidence in the verdict.

144.    Other relevant instances of Garcia's misconduct uncovered by WCDA during its reinvestigation include:

(a)    **July 1984 False Arrest and Failure to Investigate Alibi:** Garcia investigated a Mount Vernon robbery in which witnesses described two African American men fleeing the scene in a green two-door Plymouth with a "4" in the license plate. Garcia claimed that a database search identified James Taylor—but Taylor's vehicle did not match the getaway car's description–it was a brown four-door Buick with no "4" in the plate. Garcia obtained an arrest warrant and arrested Taylor. Taylor immediately provided a verifiable alibi that Garcia refused to investigate. Garcia then used an outdated photograph to secure a purported eyewitness identification. The WCDA prosecuted the case despite these inconsistencies and lack of investigation. Taylor was jailed for 13 days before posting bail, and the case was ultimately dismissed after the grand jury returned a no true bill.

(b)    **1991 trial of Jason Nicolas:** Justice Donald Silverman of Westchester County Court suppressed testimony about an alleged statement the defendant allegedly made to Garcia and other MVPD officers, finding in an unpublished decision that the officers entered the defendant's apartment without any legal basis, did not *Mirandize* the defendant, and obtained a statement through fear. Singling out Garcia's testimony in particular, the court found it was "at odds with the true facts" and that Garcia "intentionally

told falsehoods and omitted significant aspects of the events to which he testified," concluding that the "Court does not believe, in general, that it can rely on almost anything Detective Garcia had to say . . ."

(c)    **1993 Improper Identification Procedure and Witness Coaching:** Garcia and another MVPD detective conducted a photo identification procedure with eyewitnesses to a bank robbery and purportedly obtained a positive identification of a John Doe. According to MVPD paperwork, the witness viewed approximately 175 to 200 photos. When the witness was interviewed by an FBI agent, an SDNY assistant United States attorney, and a WCDA assistant district attorney interviewed the witness and learned that she had only been shown six photos and that MVPD detectives had directed her attention to Doe. The FBI agent told the WCDA prosecutor that Garcia had "helped" at least one of two witnesses select Doe's photograph. The SDNY declined to prosecute and WCDA determined it would prosecute Doe, notwithstanding the foregoing. Following a suppression hearing, the court concluded the identification procedure was unduly suggestive and suppressed it, and further required that a fair lineup procedure be held to determine if the witness could testify. She was unable to identify Doe in a fair procedure and did not testify. A second witness identified Doe at the subsequent bench trial, but was disbelieved by the court and Doe was acquitted.

(d)    **1996 Federal Corruption Investigation, Prosecution and Guilty Plea:** In May 1996, Defendants Garcia and Astorino were arrested by FBI agents for

stealing $10,000 during a sting operation staged as the execution of an arrest warrant. The sting was the product of a year-long investigation into corruption at the MVPD. Defendants Garcia and Astorino not only stole money, they also made misrepresentations about their misconduct and completed false official paperwork in the course of their duties. Garcia and Astorino pleaded guilty to federal theft and conspiracy charges.

145. Garcia's pattern of misconduct—spanning at least fifteen years—demonstrates that his conduct in Mr. Koonce's case was not an isolated incident but was part of a consistent course of corrupt and unconstitutional conduct. This conduct led the WCDA to find "serious concerns about the credibility" of Defendant Garcia.

146. As part of WCDA's reinvestigation, prosecutors and investigators also located and interviewed relevant witnesses. Among those interviewed were Samuel Guest and Charles Shuler.

147. Samuel Guest is now a retired NYPD detective. When interviewed by WCDA in 2024, he affirmed that he had testified truthfully at Mr. Koonce's trial; that he had never had a personal relationship with Mr. Koonce; that he was never interviewed by police prior to trial; and had not spoken to Mr. Koonce since June 20, 1981, the night he drove him to Manhattan.

148. Charles Shuler did not recall ever making an identification of Mr. Koonce or anyone else. He told WCDA that he did not see any of the perpetrators' faces during the incident, recalling that after he was shot he was immediately covered up by adults.

**M. THE MOUNT VERNON POLICE DEPARTMENT'S WELL KNOWN BUT UNCORRECTED HISTORY OF MISCONDUCT AND CONSTITUTIONAL VIOLATIONS, AND THE WCDA'S FAILURE TO ACT**

149. The MVPD has a documented and decades-long history of constitutional violations, including fabrication of evidence, suggestive identification procedures, false

testimony, excessive force, unlawful strip searches, planting of drugs, and racially discriminatory policing. These violations are not the product of isolated misconduct by individual officers but reflect institutional policies, customs, and practices that permitted and encouraged such conduct.

150.    Despite widely available allegations and findings of such misconduct, the WCDA uncritically accepted and prosecuted cases brought by MVPD, uncritically used MVPD officers as prosecution witnesses, and uncritically admitted in evidence in criminal proceedings evidence obtained or generated by MVPD officers, including Defendant Garcia, who were known to have fabricated evidence, filed false reports, and routinely used unduly suggestive identification procedures.

151.    In 1974, the WCDA announced a formal investigation into gambling graft within the MVPD after receiving evidence that officers were accepting payments to protect illegal gambling operations. However, no further action was reported and upon information and belief, no remedial action resulted from that investigation.

152.    In 1981, the WCDA prosecuted Jeffrey and Paul Koonce for the armed robbery underlying this lawsuit, despite the absence of any evidence connecting them to the crime; the total mismatch in their appearance to the eyewitnesses' description of the perpetrators; alibis placing both men outside of Mount Vernon at the time of the crime; the use of unconstitutionally suggestive identification procedures; and other clear discrepancies.

153.    In 1984, Garcia arrested James Taylor II, based on a purported database search for a getaway vehicle, despite Taylor's car being different in all material respects from the eyewitness description. Garcia refused to investigate Taylor's easily verifiable alibi, and secured a positive identification by using an out-of-date photograph of Taylor. Despite these apparent problems, WCDA prosecuted Taylor. The grand jury, however, refused to issue a true bill. *See supra* ¶ 144(a).

154.   In 1990, in another case prosecuted by WCDA and based on the work of MVPD detectives including Defendant Garcia, a Westchester County judge found that Garcia "intentionally told falsehoods" while under oath and concluded "the Court does not believe, in general, that it can rely on almost anything Detective Garcia had to say." The court also found that officers, including Garcia and Astorino, had no lawful basis to enter the suspect's apartment but nevertheless entered, and conducted an interrogation in "an atmosphere of intimidation" and without providing the suspect with *Miranda* warnings. *People v. Nicholas*, No. 0398/89 (Westchester County Ct. 1990). *See supra* ¶ 144(b).

155.   In 1991, a former female MVPD officer filed a federal sex discrimination lawsuit, describing a culture of routine lawbreaking by MVPD from the commissioner to beat cops. In a 1998 decision, the Second Circuit described the MVPD's institutional culture during the late 1970s and early 1980s—both before and during the tenure Defendant Commissioner Mosca, the same official who oversaw the MVPD during the investigation and prosecution of Mr. Koonce—as "deplorable." A veteran MVPD officer who served from 1972 to 1993 testified to a pervasive culture of lawlessness within the department during that time period. The Second Circuit found that Mosca, as commissioner, was a municipal policymaker whose discriminatory and retaliatory actions against a female employee were attributable to the City under § 1983. The court further found that Mosca wielded Internal Affairs as a tool for personal retaliation rather than legitimate accountability, directing subordinates to file complaints against disfavored officers for trivial infractions that were never enforced against others— further evidence that the MVPD's accountability systems were not merely absent but actively corrupted by leadership during the period of Mr. Koonce's case. *See Annis v. County of Westchester*, 136 F.3d 239, 241–49 (2d Cir. 1998).

156.   In February 1992, Damon Hairston was arrested by MVPD, indicted on two counts of murder in the second degree and related charges, wrongly convicted of manslaughter

in the first degree and criminal possession of a weapon, and sentenced to twelve-and-a-half to twenty-five years in prison. His conviction was vacated in 2011 after Hairston obtained, through a FOIL request to the City, MVPD police reports that supported his justification defense and had never been disclosed to his trial counsel. The suppressed reports documented that a named eyewitness saw one of the victim's friends with a rifle at the scene, and named a second eyewitness who was present at the scene. On the defendant's CPL § 440.10 motion, the Westchester County Court found—without a hearing—that WCDA violated *Brady* and ordered a new trial. As here, the MVPD suppressed exculpatory evidence. *People v. Hairston*, 30 Misc. 3d 1206(A) (Westchester County Ct. 2011).

157.    In 1993, WCDA took over a bank robbery case after federal prosecutors decided not to prosecute because federal investigators had concluded that Garcia and another MVPD detective had engaged in misconduct by suggesting or fabricating at least one eyewitness identification, and lying about the circumstances of the identification procedure. Despite these findings and the Department of Justice's decision not to prosecute, WCDA elected to prosecute the case. The identification was challenged by the defense and the suppression court found that the identification procedure was unduly suggestive and ordered a fair lineup to be held in order to permit the witness to testify. Once the improper suggestion and cuing was removed, the witness was unable to identify the defendant, who was acquitted. *See supra* ¶ 144(c).

158.    In 1995, after receiving reports of corruption among members of the MVPD, the FBI began an investigation into the MVPD, authorized by the United States Attorney for the Southern District of New York. In 1996, as part of that investigation, the FBI conducted a proactive sting operation targeting the MVPD, planting money in a gym bag inside an apartment and causing the targeted MVPD officers to believe the money belonged to a criminal suspect. Defendant Garcia was caught on camera stealing cash and giving some of the cash to Defendant Astorino; a third detective, Frank Lauria, was also caught stealing money on camera.

The total amount stolen was around $10,000. Defendant Garcia then called another law enforcement agency and falsely reported the amount of cash received, after which he filed a false police report in which he misrepresented the amount of cash recovered. Two months after being arrested and charged with federal corruption charges, Defendants Garcia and Astorino pleaded guilty and were sentenced each to a year and a day in jail. *See supra* ¶ 144(d).

159. In 1997, MVPD officers raided a bar, arrested an innocent bartender without any basis to believe she had committed a crime, and conducted a strip and body cavity search on her. After the search revealed no contraband, the bartender was not charged criminally and was released by MVPD. She subsequently brought a civil rights action. On a motion for summary judgment, a federal court described the "utterly outrageous facts of the matter" and found that the bartender had been arrested without probable cause and illegally searched. The Court also found that the City of Mount Vernon had an illegal policy of strip and body cavity searching all arrestees. *Flores v. City of Mount Vernon*, 41 F. Supp. 2d 439 (S.D.N.Y. 1999).

160. From 2011 through 2017, MVPD Officer Murashea Bovell secretly recorded MVPD officers engaging in systemic misconduct, including physically abusing handcuffed suspects, stealing money from suspects, planting drugs, and fabricating and falsifying sworn police reports.

161. In 2018, Rahsi McClean—who was acquitted by a jury after MVPD officers failed to preserve critical surveillance video, showed a suggestive photo array to the surviving witness, and coerced witness testimony—brought a federal civil rights action against the City and six MVPD officers, alleging, in part, false arrest, malicious prosecution, denial of a fair trial due to fabrication of evidence and false testimony, and failure to intervene. *See McClean v. City of Mount Vernon*, No. 17-CV-8192, 2018 U.S. Dist. LEXIS 204269 (S.D.N.Y. 2018).

162. Between 2018 and 2022, multiple federal civil rights actions were brought alleging that MVPD narcotics detectives made arrests without probable cause; fabricated

inculpatory evidence; suppressed exculpatory evidence; made false entries in sworn police records; and illegally strip searched and otherwise physically abused residents; and engaged in the foregoing misconduct with impunity. *See, e.g., Rutherford v. City of Mount Vernon*, 698 F. Supp. 3d 574 (S.D.N.Y. 2023); *Long v. City of Mount Vernon*, No. 18-CV-9068 (S.D.N.Y.); *Clarke v. Antonini*, No. 21 Civ. 1877, 2022 U.S. Dist. LEXIS 171707 (S.D.N.Y. 2022); *Roman v. City of Mount Vernon*, No. 21-CV-2214, 2022 U.S. Dist. LEXIS 128074 (S.D.N.Y. 2022).

163.    In December 2021, the United States Department of Justice Civil Rights Division, along with the U.S. Attorney for the Southern District of New York, announced a pattern and practice investigation into the Mount Vernon Police Department.

164.    In 2023, after an investigation into the conduct described in paragraphs 160 and 162, *supra*, the WCDA CRU announced it would vacate at least twenty-seven MVPD narcotics convictions due to "discrepancies, inconsistencies and contradictions" and "problematic identifications."

165.    In 2024, the WCDA CRU began to reinvestigate cases, including Mr. Koonce's, in which law enforcement officers convicted in the course of their duties, including Defendant Garcia, had played a significant role.

166.    In December 2024, the United States Department of Justice released the findings of its civil rights investigation into the MVPD. The DOJ found the MVPD engaged in a "pattern or practice" of constitutional violations, including: unconstitutional arrests without probable cause; excessive force; unlawful strip and body cavity searches; unlawful vehicle stops; and discriminatory policing targeting Black residents. The DOJ report described the constitutional violations as longstanding and widespread and attributed them to systemic deficiencies "rooted in a long history of municipal dysfunction" and MVPD "organizational failure", including the absence of policies addressing constitutional policies, or policies that provide insufficient, inaccurate, and/or out-of-date guidance to officers on constitutional

requirements; lack of adequate training and supervision of officers or supervisors in constitutional policing and inadequate or nonexistent internal reviews of incidents and complaints, resulting in no instruction before or after members' actions "cross the line" and a failure to hold officers accountable for misconduct. The Report noted that MVPD's electronic system for tracking misconduct complaints did not include any cases prior to 2022, meaning the City had no functioning system for tracking or reviewing officer misconduct during the period of Mr. Koonce's case or for the four decades that followed.

167.     Because misconduct complaints were not tracked by MVPD prior to 2022, and because many of the judicial decisions identifying misconduct by both MVPD and WCDA—including many cited in this Complaint—are unpublished and thus not publicly available, the full extent of misconduct by MVPD and WCDA may never be fully revealed. However, to the extent that MVPD and WCDA's misconduct prior to and after Mr. Koonce's arrest and conviction is knowable, it can only be learned through discovery of MVPD and WCDA's files, and sworn testimony of individuals with direct knowledge

168.     The conduct detailed in ¶¶ 149–166, was undertaken in accordance with unwritten policies, customs, and practices of the MVPD that existed and were in place for a substantial period of time prior to Mr. Koonce's arrest, and throughout his trial and conviction. Moreover, prior to Mr. Koonce's trial, the MVPD's unwritten policies, customs, and practices were widespread and pervasive, and well known to the WCDA, which worked with and accepted cases from the MVPD on a daily basis.

169.     The MVPD had no formal, objective, or reliable review or disciplinary process in place to handle troubled officers and/or complaints against them.  As a result, none of the MVPD officers involved in the aforementioned instances were ever disciplined or sanctioned for their misconduct.

170.     Despite being on notice of MVPD's pervasive culture of misconduct, disregard for its constitutional obligations, and total absence of training, supervision, and misconduct, the Westchester County District Attorney's Office took no action, prior to 2022, to investigate or prosecute these violations. Instead, the WCDA continued to blindly accept and prosecute MVPD's arrests without question. As a result, as in Mr. Koonce's case, for decades, WCDA routinely allowed prosecutions to go forward with fabricated inculpatory evidence, suppressed exculpatory evidence, coerced witness statements and coerced false confessions, and false testimony by MVPD officers who were prosecution witnesses.  WCDA's complicity with the MVPD (as with other law enforcement agencies throughout Westchester) was the result of WCDA's own lack of policies and procedures designed to train its own ADAs in their constitutional duties, to supervise ADAs to ensure compliance with their constitutional and statutory obligations, and to discipline those ADAs—like those in Mr. Koonce's case—who violated their constitutional and statutory obligations.

## DAMAGES

171.     As a direct and proximate result of Defendants' unconstitutional conduct, Mr. Koonce has suffered, and continues to suffer, devastating and irreparable harm to every aspect of his life. Mr. Koonce was twenty-four years old when he was arrested—a young man enrolled full-time at Mercy College studying criminal justice, working as an exterminator, and aspiring to become a parole officer to serve his community. Defendants took all of that from him. He entered prison as a young man with a future and emerged a decade later, in his words, "spit into society with no knowledge or anything."

172.     Mr. Koonce spent approximately nine years incarcerated in New York State prisons for a crime he did not commit. He endured the constant threat of violence and the dehumanizing conditions of prison life, including the fear for his physical safety that accompanies every day of wrongful imprisonment.

173.    Mr. Koonce has suffered, and continues to suffer, damages including but not limited to the following:

(a)    **Loss of Liberty.** Mr. Koonce was deprived of his physical liberty for approximately ten years of wrongful incarceration. He was also deprived of his liberty during the more than four decades that he lived under the restrictions, supervision, and stigma of a violent felony conviction.

(b)    **Physical Injury and Bodily Harm.** Mr. Koonce suffered physical beatings, sexual assaults, a fractured ankle, stabbings, serious eye injury, and other physical injuries. He has also suffered the chronic physical consequences of prolonged incarceration, including the documented effects of incarceration stress on physical health and life expectancy.

(c)    **Emotional Damages.** Mr. Koonce suffers from ongoing emotional pain and suffering directly resulting from his wrongful conviction and imprisonment.

(d)    **Loss of Educational Opportunity and Career.** At the time of his arrest, Mr. Koonce was a full-time student at Mercy College in a criminal justice program, aspiring to become a parole officer to help urban youth from communities like his own. His wrongful conviction ended his college education and permanently destroyed his career path. He never completed his degree.

(e)    **Loss of Earning Capacity and Economic Harm.** Upon his release from prison, Mr. Koonce was repeatedly fired from, or denied, jobs as a result of his criminal record. His wrongful conviction deprived him of the career trajectory and earning capacity he would have had as a college-educated criminal justice professional.

(f) **Destruction of Family Relationships.** Mr. Koonce's wrongful conviction devastated his family. His daughter, born in August 1981—just weeks after his arrest—was placed in foster care as a direct result of his incarceration. He was separated from his six year old son for whom he was the primary caregiver during the critical years of his childhood and young adulthood. His family endured the stigma of his conviction.

(g) **Stigma and Humiliation.** For more than forty-three years, Mr. Koonce bore the stigma of a violent felony conviction. He was branded a convicted felon in his community, in his workplaces, and in his family life. The stigma of the conviction permeated every aspect of his life and relationships.

(h) **Post-Release Barriers.** Upon release, Mr. Koonce faced systematic barriers to reintegration. He was denied employment opportunities, experienced housing discrimination, and was unable to form stable professional relationships due to his criminal record. Every dime he earned went to his children's education rather than building a life for himself.

174. Mr. Koonce continues to suffer the effects of his wrongful conviction and incarceration. He requires ongoing treatment for conditions directly caused by his wrongful incarceration. The chronic stress of prolonged incarceration has been associated with reduced life expectancy and increased risk of chronic health conditions. Mr. Koonce is now sixty-eight years old, having been deprived of the most productive decades of his life. The harm Defendants inflicted is permanent and ongoing.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

**42 U.S.C. § 1983 — Malicious Prosecution and Deprivation of Liberty Under the Fourth, Fifth, Sixth, and Fourteenth Amendments**
*(Defendants Garcia and Salottolo and John Does 1–10)*

175. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth here and further alleges as follows:

176. Defendants Garcia and Salottolo, individually, collectively, acting in concert, and aiding and abetting one another, and/or in concert or conspiracy with other named and unnamed individuals, intentionally, knowingly, and willfully manufactured, or caused the manufacturing of, false statements and identifications by Charles Shuler and Ronald Deighan, which they improperly compelled or induced Charles Shuler and Ronald Deighan to adopt, accusing Mr. Koonce of the armed robbery of the Vernon Stars Rod & Gun Club and shooting of Shuler.

177. Defendants Garcia and Salottolo knew that the statements and identifications would be relied on by WCDA and the court as a basis to authorize Koonce's arrest, actually arrest him, and formally initiate his prosecution, and that the statements and identifications would be introduced into evidence at Koonce's trial. Defendants then caused that false evidence to be forward to WCDA, and WCDA relied on that evidence in deciding to commence charges against Mr. Koonce. The false statements and identifications of Charles Shuler were in fact introduced during Mr. Koonce's pretrial *Wade* hearing and trial.

178. By virtue of the foregoing, Garcia and Salottolo, with actual malice, initiated, continued, or caused the initiation and continuation of, criminal proceedings against Mr. Koonce that they knew, or should have known, there was no probable cause for, and for which in fact there was no probable cause, and thereby caused Mr. Koonce to be deprived of his liberty.

179. There was no documented basis for targeting Mr. Koonce as a suspect; Mr. Koonce did not match the descriptions of the perpetrators; the sole eyewitness identification was procured through impermissibly suggestive procedures; multiple eyewitnesses failed to

identify Mr. Koonce; and the sole informant's statement was unreliable and the product of coercion.

180. Any presumption of probable cause arising from the grand jury indictment is rebutted because Defendants presented false and misleading evidence to the grand jury and withheld material exculpatory evidence that, had it been presented, would have negated probable cause.

181. Defendants not only initiated the malicious prosecution but continued it by intentionally withholding and misrepresenting facts that further vitiated probable cause. Throughout Mr. Koonce's trial, direct appeals, post-conviction proceedings, incarceration, and the decades following his release, Defendants continued to conceal their fabrication of evidence, the suggestive nature of the identification procedures, and the exculpatory material described above. This continued concealment perpetuated the prosecution's reliance on false probable cause and prevented earlier discovery of the wrongful conviction.

182. Defendants performed the above-described acts deliberately, recklessly, and with deliberate indifference to Mr. Koonce's constitutional rights. No reasonable officer would have believed that probable cause existed to arrest and prosecute Mr. Koonce.

183. Mr. Koonce is completely innocent of the armed robbery of the Vernon Stars Rod & Gun Club and shooting of Charles Shuler. The prosecution finally terminated in Mr. Koonce's favor on December 27, 2024, when the conviction was vacated and the indictment dismissed.

184. Defendants Garcia and Salottolo, knew, but withheld from WCDA, either permanently or for a substantial period of time, and therefore from the court and the defense, exculpatory or impeaching evidence that tended to negate Mr. Koonce's guilt, and which they knew or should have known the law required them to timely disclose. This evidence included

but was not limited to, the items detailed in ¶¶ 60-66, 71-75, 76-82, 84-85, 88, 89-102, 104-107, 109, 176 and 179, above.

185.    The aforesaid conduct, which Defendants Garcia and Salottolo committed individually, collectively, in concert with, and in aid of each other, and/or in concert or conspiracy with other named and unnamed individuals, operated to deprive Mr. Koonce of his rights under the Constitution and Laws of the United States:

(a)    Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based on false, fabricated, manufactured, misleading, or inherently unreliable "evidence," including the statements and testimony of witnesses and others who have been improperly influenced, coerced, or manipulated to provide such statement and testimony, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution;

(b)    Not to be deprived of his liberty absent probable cause to believe he has committed a crime, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

(c)    To timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

186.    The foregoing violations of Koonce's federal constitutional rights by Defendants Garcia and Salottolo, directly, substantially, proximately, and foreseeably caused the initiation and continuation of Mr. Koonce's criminal prosecution, his loss of liberty, his wrongful conviction, his subsequent imprisonment, and his other injuries and damages.

187.    The foregoing violations to Mr. Koonce's rights amounted to Constitutional torts and were affected by actions taken under color of State law, and within the scope of the individual Defendants' employment and authority.

188.    Defendants Garcia and Salottolo committed the foregoing violations of Mr. Koonce's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to his constitutional rights or to the effect of such misconduct on his constitutional rights. No reasonable officer during the time periods these wrongs were committed and continued would have believed this conduct was lawful.

189.    By reason of the foregoing, Defendants Garcia and Salottolo are liable to Mr. Koonce for compensatory and punitive damages.

190.    Defendants City and County are liable for these wrongs by virtue of WCDA and MVPD's policies, customs, and deliberate indifference to, and failure to train, supervise, and discipline their employees regarding such conduct, despite the likelihood that the failure to do so would result in the injuries pled here. *See* ¶¶ 247–308, *infra* (*Monell* claims against the County and the City).

191.    As a direct and proximate result of Defendants' actions, Mr. Koonce was indicted, tried, wrongly convicted, and imprisoned for approximately nine years, and three years wrongfully subject to parole supervision, and suffered the other grievous damages and continuing damages set forth above.

## SECOND CAUSE OF ACTION

**42 U.S.C. § 1983 — Evidence Manufacturing; Denial of a Fair Trial Under the Fifth, Sixth, and Fourteenth Amendments**
*(Defendants Garcia and Salottolo and John Does 1–10)*

192.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth here and further alleges as follows:

193. Defendants Garcia and Salottolo, individually, collectively, and acting in concert and aiding and abetting the other, and/or in concert or conspiracy with other named and unnamed individuals, intentionally, recklessly, and with deliberate indifference to Mr. Koonce's constitutional rights manufactured false evidence against Mr. Koonce, by both affirmative acts and knowing omissions.

194. The fabricated evidence included:

(a) **No Basis of Suspicion:** Defendants suppressed the fact that there was no investigative basis for targeting Mr. Koonce as a suspect prior to his inclusion in the photographic array, and instead fabricated that information had been received prior to the composition of the photo array that made Mr. Koonce a suspect.

(b) **Photographic Array:** Defendants constructed a manipulated photographic array designed to make Mr. Koonce's photograph stand out, then suppressed the true composition of the array—that it was composed of individuals with armed robbery convictions rather than individuals resembling Mr. Koonce—and Detective Salottolo gave false testimony about how the array was assembled. The true composition of the array was material *Brady* information that was never disclosed prior to Mr. Koonce's conviction.

(c) **Non-Identifications:** Defendants suppressed the fact that multiple eyewitnesses failed to identify him as one of the perpetrators until Mr. Koonce's pretrial hearing, and created false police reports omitting these exculpatory details.

(d) **Cuing the Witnesses:** During the manipulated and impermissibly suggestive photo array and the impermissibly suggestive and unnecessary one-on-one showup procedure, Garcia and Salottolo improperly gave the

witness undisclosed suggestive cues and prompts designed to ensure that the witness would positively identify Mr. Koonce, even though he had no independent basis to do so. Defendants failed to disclose these facts to the prosecution and defense, omitted them from their police reports, and concealed them throughout Mr. Koonce's trial.

(e) **Deighan Statement:** Defendants procured a false statement from an incentivized informant who was under arrest and who thus had a powerful motive to cooperate, then suppressed the criminal complaint and arrest, and the circumstances under which the statement was obtained, including police suggestion, feeding of non-public information, coercion, and/or promises of leniency or other benefits.

195. These Defendants presented this fabricated evidence to WCDA which, relying on that evidence, decided to and did charge Mr. Koonce with multiple felonies.

196. These Defendants deprived Mr. Koonce of his right to a fair trial by withholding material exculpatory and impeachment evidence from Mr. Koonce's defense counsel and the Court, and knowingly omitting material facts from their presentation to WCDA when WCDA was deciding whether to charge Mr. Koonce.

197. Defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Koonce's clearly established constitutional rights. No reasonable officer during the time periods these wrongs were committed and continued would have believed this conduct was lawful.

198. Mr. Koonce is completely innocent of the armed robbery of the Vernon Stars Rod & Gun Club and shooting of Charles Shuler. The prosecution finally terminated in Mr.

Koonce's favor on December 27, 2024, when the conviction was vacated and the indictment dismissed.

199. As a direct and proximate result of Defendants' actions, Mr. Koonce was indicted, tried, wrongly convicted, and imprisoned for approximately nine years, wrongfully subject to parole supervision for three years, and suffered other grievous and continuing damages and injuries set forth above.

200. Defendants County and City are liable for these wrongs by virtue of WCDA's and the MVPD's policies, customs, and deliberate indifference to, and failure to train, supervise, and discipline their employees regarding such conduct, despite the likelihood that the failure to do so would result in the injuries pled here. *See* ¶¶ 247–308, *infra* (*Monell* claims against the County and the City).

## **THIRD CAUSE OF ACTION**

**42 U.S.C. § 1983 — Unreasonable Seizure under the Fourth Amendment, Denial of Due Process and a Fair Trial under the Fifth, Sixth, and Fourteenth Amendments, and Denial of Reasonable Bail under the Eighth Amendment, Due to the Pretrial Withholding of Favorable Evidence Likely to Result in Plaintiff's Release from Custody ("Russo Claim")**
*(Defendants Garcia and Salottolo, and John Does 1–10)*

201. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth here and further alleges as follows:

202. Following the initiation of Mr. Koonce's prosecution with the filing of a Criminal Court complaint and a proceeding before a grand jury, which would decide whether the evidence supported formally charging Mr. Koonce by indictment, he was bound over for trial.

203. Under New York law, as well as the Eighth and Fourteenth Amendments to the United States Constitution, the court, following the filing of charges, was required, upon application of the defendant, to consider whether to fix a reasonable bail so that the defendant could obtain his release.

204. Under New York law, the strength of the prosecution's case was a significant factor for a court in determining whether to fix a reasonable bail and the amount of such bail.

205. Despite knowing this, Defendants Garcia and Salottolo withheld, or caused to be withheld, from Mr. Koonce and his lawyer, the grand jury, WCDA, and the court exculpatory and impeachment evidence and other evidence favorable to the defense that completely undermined the strength of the prosecution's case.

206. Had such evidence been timely disclosed, the charges against Mr. Koonce likely would not have survived a preliminary hearing or the determination by the grand jury, and/or the court would have released Mr. Koonce on his own recognizance or on reasonable bail.

207. The failure to make timely disclosure of such obviously significant evidence undermining the entire case caused Mr. Koonce to be unnecessarily and unreasonably deprived of his liberty.

208. In addition, Defendants Garcia and Salottolo falsely represented to WCDA that one eyewitness had positively identified Mr. Koonce in a photo array and that another individual had provided a statement implicating Mr. Koonce.

209. In fact, the eyewitness identification and the witness statement were the product of Defendants Garcia and Salottolo suggestion, coercion, pressure, threats and/or promises, and undisclosed benefits.

210. This conduct was shocking to the conscience.

211. It violated Mr. Koonce's constitutional rights to be free of unlawful or unreasonable seizure under the Fourth and Fourteenth Amendments, to reasonable bail under the Eighth and Fourteenth Amendments, to a fair trial under the Sixth and Fourteenth Amendments, and to due process of law under the Fifth and Fourteenth Amendments.

212. By virtue of the foregoing, the Individual Defendants are liable, pursuant to 42 U.S.C. § 1983, for the violation of Mr. Koonce's constitutional rights and his resultant injuries.

213.    Defendants County and City are liable for these wrongs by virtue of WCDA's

and the MVPD's policies, customs, and deliberate indifference to, and failure to train,

supervise, and discipline their employees regarding such conduct, despite the likelihood that

the failure to do so would result in the injuries pled here. *See ¶¶ 247–308, infra* (*Monell* claims

against the County and the City).

## FOURTH CAUSE OF ACTION

**42 U.S.C. § 1983 — Denial of Due Process and a Fair Trial
under the Fifth, Sixth, and Fourteenth Amendments by Withholding Evidence
Favorable to the Defense ("*Brady* Claim")**
*(Defendants Garcia and Salottolo, and John Does 1–10)*

214.    Plaintiff repeats and realleges each and every allegation contained in the

preceding paragraphs as if fully set forth here and further alleges as follows:

215.    At all relevant times, Mr. Koonce had a right—under the Fifth, Sixth, and

Fourteenth Amendments to the United States Constitution, and *Brady v. Maryland*, 363 U.S.

83 (1963) and its progeny—to timely disclosure to him, by the prosecution, of all evidence in

its possession, custody, or control that was favorable to his defense, either because it tended to

show his innocence, tended to impeach the credibility of the prosecution's witnesses against

him, or both ("*Brady* material").

216.    In furtherance of this right, police officers, including Defendants Garcia and

Salottolo, had a duty to timely disclose, or to ensure the timely disclosure of, all potential *Brady*

material to WCDA so that it could disclose that information to the defense.

217.    Defendants Garcia and Salottolo, individually, collectively, acting in concert

with each other, knowingly, willfully, intentionally, recklessly, and/or with deliberate

indifference to Koonce's constitutional rights, suppressed from WCDA and Koonce (a) the

exculpatory and impeaching information detailed in ¶¶ 60-66, 71-75, 76-82, 84-85, 88, 89-102,

104-107, 109, 176 and 179 above; (b) their creation of false police reports; (c) their false

representations to WCDA to convince that office to criminally charge Mr. Koonce; and (d) their own and each other's misconduct.

218.    As a result of those defendants' suppression, WCDA was unable to disclose to Mr. Koonce the exculpatory and impeaching information detailed in the preceding paragraphs, and to correct the false testimony and argument that flowed from the suppression of that evidence.

219.    The suppressed evidence was material, likely to influence a jury's decision, and there is a reasonable probability that had the evidence been disclosed to the defense, the result of Mr. Koonce's trial would have been different.

220.    Defendants Garcia, Salottolo, and Astorino's actions deprived Mr. Koonce of his right:

    (a)    Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned based on false, fabricated, manufactured, misleading, or inherently unreliable "evidence," including the statements and testimony of witnesses who have been improperly influenced, coerced, or manipulated to provide such statements and testimony, in violation of the Due Process and Fair Trial Clauses of the Fifth, Sixth and Fourteenth Amendments to the United States Constitution;

    (b)    Not to be deprived of his liberty absent probable cause to believe he has committed a crime, in violation of his rights under the Fourth and Fourteenth Amendments to the United States Constitution; and

    (c)    To timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial

Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

221. The foregoing violations of Mr. Koonce's rights amount to constitutional torts and were affected by actions taken under color of State law, and within the scope of Defendants Garcia and Salottolo's, and John Doe's, employment and authority.

222. Defendants Garcia and Salottolo and others committed the foregoing violations of Mr. Koonce's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Mr. Koonce's constitutional rights or to the effect of such misconduct on those rights.

223. By reason of the foregoing, Defendants Garcia and Salottolo, and others are liable to Mr. Koonce for the damages detailed in ¶¶ 171–174, above.

224. Defendants County and City are liable for these wrongs by virtue of WCDA's and the MVPD's policies, customs, and deliberate indifference to, and failure to train, supervise, and discipline their employees regarding such conduct, despite the likelihood that the failure to do so would result in the injuries pled here. *See* ¶¶ 247–308, *infra* (*Monell* claims against the County and the City).

## FIFTH CAUSE OF ACTION

### 42 U.S.C. § 1983 — Pre-Trial Detention Without Probable Cause In Violation of the Fourth Amendment of the U.S. Constitution
*(Defendants Garcia, Salottolo, and John Does 1-10)*

225. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth here and further alleges:

226. Defendants Garcia and Salottolo initiated, or caused the initiation of, criminal proceedings against Mr. Koonce.

227. Defendants Garcia and Salottolo objectively lacked probable cause to initiate criminal proceedings against Mr. Koonce for the Vernon Stars Robbery.

228. The grand jury indictment was procured using objectively false information and is therefore irrelevant.

229. As a result of Defendants Garcia and Salottolo's initiation of criminal proceedings without probable cause, Mr. Koonce was remanded to the Westchester County Jail pre-trial upon his arrest on June 30, 1981 after bail was set at $25,000 bond or $5,000 cash.

230. While incarcerated at the Westchester County Jail, Mr. Koonce was an innocent bystander to a riot, which triggered a brutal response by law enforcement agencies. Law enforcement and/or corrections officers forced Mr. Koonce (and others) to strip naked and march in close contact with other naked inmates while zip tied, to march over broken glass, and was beaten with axe handles and other weapons.

231. Following the riot, Mr. Koonce's bail was reduced to $5,000 bond or $500 cash, and he was released on or about July 23, 1981.

232. The prosecution terminated in Mr. Koonce's favor when his conviction was vacated and the indictment dismissed on December 27, 2024.

233. Contributing to the improper actions and inactions of Defendants Garcia and Salottolo was the culture of hostility and racism of the MVPD.

234. Consequently, Defendants Garcia and Salottolo are liable for damages under 42 U.S.C. § 1983 pursuant to *Manuel v. City of Joliet, Ill.*, 137 S.Ct. 911 (2017). Further, given that this cause of action sounds purely under the Fourth Amendment, malice and any other subjective belief of Defendants Garcia and Salottolo is irrelevant.

### SIXTH CAUSE OF ACTION

**42 U.S.C. § 1983 — Failure to Intervene**
*(Defendants Garcia, Salottolo, Astorino, and John Does 1–10)*

235. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth here and further alleges:

236. By their conduct and under color of state law, each of Defendants Garcia, Salottolo, Astorino, and John Doe was present for and aware of the constitutional violations being committed by their fellow officers and had opportunities to intervene on behalf of Mr. Koonce to prevent his malicious prosecution, false imprisonment, and his deprivation of liberty without due process of law, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so.

237. These Defendants' failures to intercede violated Mr. Koonce's clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments, and not to have fabricated evidence used against him.

238. No reasonable officer during the time periods these wrongs were committed and continued would have believed that failing to intervene to prevent Defendant Garcia and/or Defendant Salottolo and/or Defendant Astorino, and others, from fabricating inculpatory evidence, intentionally using unduly unreliable identification procedures and/or direct suggestion and/or coercion to obtain inculpatory identifications and statements, withholding material, exculpatory and/or impeachment evidence, deliberately failing to conduct a constitutionally adequate investigation, deliberately placing a restrained criminal defendant in imminent danger of serious bodily harm or death, causing Mr. Koonce to be arrested and prosecuted without probable cause, and the other acts detailed above, were lawful.

239. Mr. Koonce is completely innocent of the armed robbery of the Vernon Stars Rod & Gun Club and the shooting of Charles Shuler. The prosecution finally terminated in Mr. Koonce's favor on December 27, 2024, when the conviction was vacated and the indictment dismissed.

240. As a direct and proximate result of Defendants' actions, Mr. Koonce was indicted, tried, wrongly convicted, and imprisoned for approximately nine years, and three

years wrongfully subject to parole supervision, and suffered the other grievous damages and continuing damages set forth above.

**SEVENTH CAUSE OF ACTION**

**42 U.S.C. § 1983 — Conspiracy to Deprive of Civil Rights**
*(Defendants Garcia, Salottolo, Astorino, John Does 1–10)*

241.   Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth here and further alleges:

242.   Defendants Garcia, Salottolo, and Astorino, together with WCDA prosecutors James H. O'Brien (acting as a delegated final policymaker for then DA Carl A. Vergari) and Mary Smith, and John Does 1-10 and John Doe 12, agreed among themselves and with others to act in concert to deprive Mr. Koonce of his clearly established Fourth, Fifth, Sixth, and Fourteenth Amendment rights to be free from unreasonable searches and seizures, malicious prosecution, deprivation of liberty without due process of law, and to receive a fair trial.

243.   Defendants, by express agreement or tacit understanding, agreed among themselves to fabricate evidence, suppress exculpatory material, and create a false narrative to support the malicious prosecution of Mr. Koonce. This agreement is evidenced by the coordinated nature of the misconduct, including the use of the same coercive and suggestive eyewitness identification techniques across multiple investigative steps, the consistent failure to document exculpatory information, and the mutual suppression of misconduct.

244.   In furtherance of the conspiracy, each Defendant engaged in and facilitated numerous overt acts, including, without limitation, the following:

   (a)   Between June 22, 1981 and July 2, 1981, Defendants Garcia and Salottolo (1) fabricated inculpatory evidence, including false identifications and false inculpatory statements that were the product of manipulated and unduly suggestive identification procedures and coercive interrogations; (2) falsified police reports and other accounts of their investigative activities

and interrogations; (3) failed to document and disclose material exculpatory evidence to prosecutors; and (4) failed to document the investigation in material respects;

(b) On or about June 30, 1981, ADA James H. O'Brien and Defendants Garcia and Salottolo agreed to and did conduct an illegal, impermissibly suggestive and unnecessary one-on-one hospital showup, for the purpose of continuing Mr. Koonce's false arrest, maliciously prosecuting him, and depriving him of a fair trial;

(c) On or about July 2, 1981, Defendants Garcia and Salottolo, together with unknown others, procured a false statement implicating Mr. Koonce from an incentivized informant through improper pressure, coercion and/or promises of leniency, and agreed to and did suppress the impeachment evidence related to that statement, including the evidence impeaching the quality of the investigation itself and the trustworthiness of the officers themselves;

(d) On or about July 6, 1981, Defendants Garcia, Salottolo, and Astorino caused a witness to falsely identify Paul Koonce as one of the perpetrators of the Vernon Stars robbery through the use of suggestive suggesting prompting, and/or coercion, despite knowing he was innocent of that crime, for the purpose of strengthening the fabricated case against Jeffrey Koonce and ensuring his wrongful conviction;

(e) Sometime between June 1981 and October 1982, ADA Mary Smith and Defendant Salottolo agreed that Salottolo would falsely testify at pretrial hearings and/or at trial about the array's true composition and the absence of any basis to include Mr. Koonce in the array, and agreed to and did

52

suppress the impeachment evidence related to the array's composition, in order to continue Mr. Koonce's false arrest and to maliciously prosecute Mr. Koonce and deny him a fair trial;

(f)    Defendants Garcia, Salottolo, Astorino, and ADA Mary Smith provided or caused to be provided false, misleading, and incomplete information to the court and/or the grand jury;

(g)    ADA Mary Smith made false and misleading arguments to the court and the jury intended to bolster the false identifications of Mr. Koonce and to mislead the jury concerning physical evidence purportedly connecting Mr. Koonce to the crime that had been fabricated by Defendants Garcia, Salottolo, and Astorino;

(h)    Defendants Garcia, Salottolo, Astorino, and/or ADA Smith suppressed material exculpatory and impeachment evidence from the court and the defense, both before and during trial, and continuing through post-conviction proceedings.

245.    As a direct and proximate cause of Defendants' conspiracy, Mr. Koonce was deprived of his constitutional rights, wrongly convicted, and imprisoned for approximately nine years, and suffered the other grievous damages and injuries set forth above.

246.    The County is liable for these wrongs by virtue of its policymaker, O'Brien's, direct participation in this conspiracy, concerted action, and aiding and abetting the other named defendants to commit the wrongs detailed above.

## EIGHTH CAUSE OF ACTION

### 42 U.S.C. § 1983 — Municipal Liability (*Monell*)
*(Defendant County of Westchester based on conduct of the WCDA)*

247.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth here and further alleges:

248.    The County of Westchester, through the WCDA, maintained policies, customs, and/or practices that caused the violation of Mr. Koonce's constitutional rights, and/or was deliberately indifferent to the constitutional rights of individuals prosecuted by its office, evidenced by the WCDA's failure to train and supervise its prosecutors, and investigate misconduct alleged to have been committed.

249.    At all times relevant to this Complaint, the elected District Attorney of Westchester County held final policymaking authority over the WCDA's training, supervision, *Brady* compliance, and disciplinary policies.

250.    The successive elected District Attorneys during and after the relevant period—Carl A. Vergari (1968–1993), Jeanine Pirro (1994–2005), and Janet DiFiore (2006–2016)—each possessed final policymaking authority over the operations, policies, and practices of the WCDA with respect to the prosecution of criminal cases, the training and supervision of assistant district attorneys, and the office's trial compliance with constitutional obligations including *Brady v. Maryland*, and their ongoing, post-conviction obligation to disclose *Brady* material suppressed during trial.

251.    Specifically, the WCDA, through its assistant district attorneys, directed the impermissibly suggestive one-on-one hospital showup of Mr. Koonce; engaged in pervasive summation misconduct including racially and socioeconomically prejudicial statements, a race-based theory of identification reliability unsupported by any evidence, inflammatory appeals to fear, personal vouching for witness credibility, assertion of facts not in evidence, improper comments on a co-defendant's silence, and civic duty arguments as more fully described above; knowingly elicited and failed to correct Detective Salottolo's false testimony about the composition of the photo array; and failed to disclose *Brady* material to the defense regarding the true composition of the array and the suggestiveness of the identification procedures.

252.    The WCDA's misconduct in Mr. Koonce's case was in accordance with the WCDA's persistent, widespread, and long-standing pattern of similar misconduct in the course of prosecuting criminal cases.

253.    As evidenced by multiple appellate decisions both before and after[1] Mr. Koonce's conviction, courts repeatedly found that assistant district attorneys in the WCDA engaged in prosecutorial misconduct spanning decades, under successive elected District Attorneys, including summation misconduct and other trial misconduct:

(a)    *People v. Pierce*, 1 A.D.2d 680, 146 N.Y.S.2d 541 (2d Dep't 1955) (judgment reversed and new trial ordered; cross-examination of defendant regarding his post-arrest silence was improper and prejudicial).

(b)    *People v. Weis*, 30 A.D.2d 877, 292 N.Y.S.2d 986 (2d Dep't 1968) (conviction reversed; prosecutor deliberately placed before the jury inadmissible and prejudicial evidence through statements during summation).

(c)    *People v. Mirenda*, 23 N.Y.2d 439 (1969) (new trial granted based on cumulative effect of numerous errors, including multiple instances of prosecutorial summation misconduct in the form of improper comments on witness credibility, burden shifting, and improper reference to the defendant's silence).

(d)    *People v. Edwards*, 55 A.D.2d 903, 390 N.Y.S.2d 595 (2d Dep't 1977) (conviction reversed based on the prosecutor's improper attacks on defense counsel during summation).

---

[1] Post-incident evidence is relevant to a claim of municipal liability as it may "shed some light on what policies existed in the city on the date of an alleged deprivation of constitutional right." *Bordanaro v. McLeod*, 871 F.2d 1151, 1167 (1st Cir. 1989); *see also Henry v. County of Shasta*, 132 F.3d 512, 519 (9th Cir. 1997) ("[W]e reiterate our rule that post-event evidence is not only admissible for purposes of proving the existence of a municipal defendant's policy or custom, but is highly probative with respect to that inquiry.").

(e)     *People v. Brabham*, 71 A.D.2d 1006, 420 N.Y.S.2d 494 (2d Dep't 1979) (court found the prosecutor used improper inflammatory language during summation; error harmless).

(f)     *People v. Ball*, 77 A.D.2d 625, 430 N.Y.S.2d 122 (2d Dep't 1980) (conviction reversed; court found the prosecutor's remarks in summation, which distorted the issue before the jury, to be improper and highly prejudicial).

(g)     *People v. Marin*, 102 A.D.2d 14, 478 N.Y.S.2d 650 (2d Dep't 1984) (arising from the December 1980 Stouffer's Inn fire that killed twenty-six people; trial court dismissed the conviction, finding that the prosecutor's summation went "beyond the proven facts" of the case, and stated it would have declared a mistrial based on the summation alone; Appellate Division and Court of Appeals affirmed dismissal).

(h)     *People v. Chandler*, 119 A.D.2d 764, 501 N.Y.S.2d 172 (2d Dep't 1986) (court found that the prosecutor improperly commented on the defendant's silence but curative instructions sufficient to cure error).

(i)     *People v. Smith*, 127 A.D.2d 864, 512 N.Y.S.2d 244 (2d Dep't 1987) (conviction reversed; in addition to the *Brady* violation described infra, the court found that the prosecution elicited improper bolstering and unqualified opinion testimony to explain a witness's failure to identify defendant, and compounded the error in summation).

(j)     *Dordal v. Reid*, No. 84 Civ. 5765, 1986 U.S. Dist. LEXIS 21432 (S.D.N.Y. Aug. 18, 1986) (federal court reviewing Westchester County conviction on habeas corpus noted the court had previously characterized the prosecutor's summation conduct as "clearly improper" in the co-defendant's case).

(k)   *People v. Bryant*, 163 A.D.2d 406, 559 N.Y.S.2d 16 (2d Dep't 1990) (court found that the prosecutor improperly referenced the defendant's failure to testify, but deemed error harmless).

(l)   *People v. Sansevero*, 185 A.D.2d 256, 586 N.Y.S.2d 148 (2d Dep't 1992) (court found that the prosecutor engaged in improper cross-examination but harmless in light of prompt curative instruction).

(m)   *People v. Martinez*, 186 A.D.2d 153, 587 N.Y.S.2d 715 (2d Dep't 1992) (conviction reversed; court found defendant was prejudiced by prosecutorial misconduct at trial when the prosecutor "abused" a ruling by improperly suggesting to the jury that the defendant's justification claim was "an afterthought created or fabricated").

(n)   *People v. Drake*, 204 A.D.2d 478, 611 N.Y.S.2d 904 (2d Dep't 1994) (court found that the prosecutor's cross-examination "exceeded the bounds of propriety" and was "deserving of criticism"; however, error unpreserved for appellate review).

254.   Courts also found that WCDA prosecutors suppressed exculpatory evidence and/or presented false or misleading testimony in violation of defendants' constitutional rights, including:

(a)   *People v. Stanley*, 81 A.D.2d 842 (2d Dep't 1981) (conviction reversed for prejudicial joinder and failure to disclose exculpatory witness statement under *Brady v. Maryland*).

(b)   *Perkins v. Le Fevre*, 691 F.2d 616 (2d Cir. 1982) (habeas relief granted; court found due process violation where WCDA suppressed impeachment evidence and knowingly permitted a critical prosecution witness to testify

falsely about his criminal history, in violation of *Brady v. Maryland* and *Napue v. Illinois*).

(c) *People v. Smith*, 127 A.D.2d 864, 512 N.Y.S.2d 244 (2d Dep't 1987) (conviction reversed; WCDA withheld material evidence that a police officer had engaged in acts of official misconduct aimed at influencing the investigation to focus on the defendant, in violation of *Brady v. Maryland*).

(d) *People v. Dunn*, 149 A.D.2d 528, 540 N.Y.S.2d 725 (2d Dep't 1989) (court noted its "strong disapproval" of the WCDA's failure, in violation of *Brady v. Maryland*, to disclose exculpatory information to the defense during trial).

(e) *People v. Makrinos*, 226 A.D.2d 479, 641 N.Y.S.2d 321 (2d Dep't 1996) (court found that the WCDA's failure to disclose exculpatory evidence constituted a violation of Brady v. Maryland).

(f) *People v. Hairston*, 30 Misc. 3d 1206(A) (Westchester County Ct. 2011) (In a 1992 trial, WCDA withheld plainly exculpatory material, including the specifically requested names of eyewitnesses and statements and testimony that supported defendant's justification defense, in violation of *Brady*; vacatur granted without a hearing).

255. In the decades after Mr. Koonce's conviction, courts continued to find the same categories of WCDA misconduct—summation impropriety and *Brady* suppression—including:

(a) *People v. Rodriguez*, 281 A.D.2d 644 (2d Dep't 2001) (WCDA failed to timely disclose *Brady* material to the defense; defense nevertheless had sufficient time to prepare defense).

(b)   *People v. Warren*, 304 A.D.2d 594 (2d Dep't 2003) (WCDA failed to timely disclose *Brady* material to the defense; defense nevertheless had sufficient time to prepare defense).

(c)   *People v. Santana*, 5 A.D.3d 798 (2d Dep't 2004) (prosecutor made improper statements during opening; error harmless).

(d)   *People v. Stein*, 10 A.D.3d 406 (2d Dep't 2004) (judgment vacated; defendant denied a fair trial by WCDA's failure to disclose evidence highly relevant to the issue of witness credibility, and failure was aggravated by the prosecutor's argument during summation).

(e)   *DiSimone v. Phillips*, 461 F.3d 181 (2d Cir. 2006) (WCDA suppressed exculpatory evidence that another individual admitted stabbing the victim until near the close of the prosecution's case despite prior requests; conviction vacated), *aff'd in part*, 518 F.3d 124 (2d Cir. 2008).

256.   In nearly every one of the aforementioned decisions, WCDA aggressively defended its challenged conduct, often advancing arguments at odds with well-settled law.  For example, in *Hairston*, *supra*, the WCDA argued, contrary to the law, that its suppression of two police reports—one documenting the names of two eyewitnesses and describing that one of them reported seeing one of the victim's friend's with a rifle, consistent with defendant's justification defense; and the other documenting that witness's consistent grand jury testimony—did not violate *Brady* because WCDA had provided the witness's name in another context, and had disclosed a third police report that did not reflect this information.  The court found these arguments to be contrary to the law, and further described how the trial ADA exploited the suppression of this critical information by arguing in summation that there was no credible evidence in the case that there was a rifle or shotgun at the scene before the defendant fired. The trial ADA, George Bolen, was not disciplined for this conduct. Nor was

Bolen disciplined for his 1990 conduct in the wrongful conviction of Jeffrey Deskovic, discussed *infra*, in which Bolen conspired with others to fabricate evidence and knowingly elicited and failed to correct false testimony designed to neutralize DNA evidence that exculpated Mr. Deskovic pre-trial.

257.    In addition to these published decisions, many additional, unpublished rulings within the sole knowledge of the WCDA, establish WCDA prosecutors regularly engaged in this type of misconduct prior to Mr. Koonce's conviction.

258.    These judicial findings of prosecutorial misconduct (and others) span three successive elected District Attorneys—Carl A. Vergari (1968–1993), Jeanine Pirro (1994–2005), and Janet DiFiore (2006–2016)—as well as numerous individual assistant district attorneys.

259.    The persistence of the same categories of misconduct—summation impropriety, *Brady* suppression, and presentation of false testimony—across multiple administrations and spanning nearly eight decades demonstrates that the WCDA's failures were institutional, not isolated.

260.    The pattern of prosecutorial misconduct in Westchester County resulted in numerous wrongful convictions. In addition to Mr. Koonce, at least seven individuals were wrongfully convicted of serious crimes in Westchester County between 1976 and 2004, all of whom served decades in prison as the WCDA continued their malicious prosecution and violated their ongoing duty to disclose *Brady* material suppressed during trial, including:

> (a)    **Leonard Mack (convicted 1976, exonerated 2023).** Mr. Mack was wrongly convicted of first-degree rape in 1976. Like Mr. Koonce, Mr. Mack did not resemble the eyewitnesses' descriptions; had no connection to the victims or the crime; and had a corroborated alibi for the time of the crime. Also like Mr. Koonce, Mr. Mack became a suspect randomly: he was subject

to a traffic stop because he was Black. Thereafter, and mirroring Mr. Koonce's case, law enforcement created an impermissibly suggestive and unnecessary one-on-one showup (despite the absence of any exigency), and used undisclosed suggestion, including prompting and priming the witness, to fabricate a positive identification of Mr. Mack. These were followed by additional suggestive procedures, including an improperly suggestive photo array that caused Mr. Mack to stand out, and yet another impermissibly suggestive and unnecessary one-on-one showup.   Despite the abundant evidence that Mr. Mack was not the perpetrator—he was also excluded by serological evidence—and the use of impermissibly suggestive identification procedures, the WCDA went forward with the prosecution. At trial, prosecutors elicited and failed to correct false testimony. As in Mr. Koonce's case, WCDA obtained a wrongful conviction of Mr. Mack. Mr. Mack was wrongly imprisoned for over 7-and-a-half years, followed by approximately two-and-a-half years on parole. He was exonerated by DNA evidence in 2023, which proved the real perpetrator was a serial sexual assailant. *See Mack v. Westchester County, et al.*, 24-cv-08990-KMK-AEK (S.D.N.Y).

(b)    **Charles Dabbs (convicted 1984, exonerated 1991).** Charles Dabbs was arrested and wrongly convicted of rape despite a significant difference between the victim's description of the perpetrator missing his front teeth and Mr. Dabbs having all of his teeth. Mr. Dabbs sought post-conviction DNA testing and WCDA opposed. The Westchester Supreme Court ordered testing, noting the prevalence of eyewitness misidentification and the constitutional entitlement to exculpatory evidence, and rejected WCDA's

attempt to hold him to threshold showing that the testing would be viable. The DNA testing exonerated Mr. Dabbs.

(c) **Terry Chalmers (convicted 1987, exonerated 1995).** Terry Chalmers was wrongly convicted of rape based on the mistaken identification of the victim, who, as in Mr. Koonce's case, was shown multiple suggestive identification procedures in which Mr. Chalmers was the only participant to recur. As in Mr. Koonce's case, the eyewitness's identification was the only evidence connecting Mr. Chalmers to the crime. He was exonerated in 1995 after he was excluded by DNA testing.

(d) **Jeffrey Deskovic (convicted 1990, exonerated 2006).** Jeffrey Deskovic was convicted of murder and rape at age sixteen based on a coerced false confession, despite DNA testing excluding Mr. Deskovic, pretrial, as a contributor. The WCDA decided to advance the prosecution of Mr. Deskovic despite the exculpatory DNA, and continued to hide exculpatory evidence from him until after his 2006 exoneration, as revealed by his subsequent civil rights lawsuit. *See Deskovic v. City of Peekskill, et al.,* 07-cv-08150-KMK-GAY (S.D.N.Y.) In order to obtain Mr. Deskovic's wrongful conviction, the trial prosecutor, George Bolen conspired with others to fabricate evidence that provided a false explanation for the exculpatory DNA results and present that fabricated evidence to the court and the defense, suppressing the truth. As in Mr. Koonce's case, Mr. Bolen also knowingly elicited and failed to correct false testimony, made false arguments to the jury, and engaged in summation misconduct, including arguing facts not in evidence and making appeals to emotion. Mr. Bolen was not disciplined for his misconduct in this case, and went on to violate

at least one other criminal defendant's constitutional rights by suppressing exculpatory evidence in 1992. *See supra* ¶¶ 254(f), 256.

(e)    **Selwyn Days (convicted 2004, exonerated 2017).** Selwyn Days was convicted of a double murder based on a partially recorded, coerced false confession. Like Mr. Koonce, no physical evidence connected Mr. Days to the crime and he had a corroborated alibi placing him in another state at the time of the murders. In addition to using improper, coercive interrogation procedures to obtain a false, fabricated confession from Days and false statements implicating Days from others, police officers fabricated official reports and suppressed favorable evidence. Despite the foregoing, WCDA subjected Days to five separate trials. At some or all of those trials, law enforcement witnesses offered false testimony, which WCDA did not correct. At the last two trials, WCDA altered its theory of the case to expand the timeframe during which the crime occurred in order to undermine Mr. Days's alibi. In December 2024, DA Rocah announced that, through reinvestigation of the case, the WCDA had identified two other responsible parties with no connection to Mr. Days.

261.    In addition to the above policies and custom, the WCDA exhibited deliberate indifference to the constitutional rights of individuals prosecuted by its office. The WCDA had no written *Brady* disclosure policy, no formal rules of behavior governing how cases would be prosecuted and when (if ever) discipline for misconduct would be warranted, and no formal disciplinary system for investigating or disciplining prosecutors who violated the rights of criminal defendants.

262.    While the WCDA maintained employee instructional materials governing relatively minor personnel issues, there were no written standards by which prosecutors'

conduct during the course of criminal cases would be assessed for discipline, much less any possible penalty that could be imposed.

263.    The lack of any WCDA internal protocols for training or disciplining assistant district attorneys at the time of Mr. Koonce's trial is evidenced from two 1990 decisions concerning the WCDA's pattern of abusing court process through the misuse of trial subpoenas. *See People v. Natal*, 75 N.Y.2d 379, 384-85 (1990) and *People v. Warmus*, 148 Misc.2d 374 (Westchester C'ty Ct. June 21, 1990).

264.    As is set forth in these decisions, the WCDA ignored decades-old, well-settled law requiring trial subpoenas be made returnable to the trial court, and instead made trial subpoenas returnable to the issuing ADA. The WCDA continued this practice despite repeated admonitions by Trial Judges to the District Attorney. *See Natal*, 75 N.Y.2d at 384-385 ("[s]uch conduct is all the more disturbing in light of apparent prior admonitions by Trial Judges to the District Attorney concerning similar misuse in other cases.") The *Natal* Court warned WCDA: "The District Attorney's subpoena practice should not be replicated."

265.    Despite this clear warning from the State's highest court, the WCDA continued this practice, failed to implement any remedial policies or training, failed to investigate prosecutors who continued to abuse process, and in fact rewarded prosecutors who continued to employ this condemned practice.

266.    In *Warmus,* the court found that the trial prosecutor violated three laws in the course of his official prosecutorial duties: General Business Law § 380-b; CPL 610.30(2); and CPL 610.25(1). Importantly, the trial prosecutor was, at the time, the Deputy Chief of the Homicide and Special Investigations Bureau of the Westchester County District Attorney's Office. He testified under oath that his "efforts to keep up with new legal developments, which he admits is required by his official position, depend on his current caseload. [The WCDA] has

'no uniform systematic distribution' of new legal developments, although different persons may disseminate recent decisions on an ad hoc basis." *Warmus*, 148 Misc.2d at 377.

267. The *Warmus* Court noted that while it invited WCDA to provide testimony from a superior of the trial ADA to "help the court understand the context in which his actions occurred," "the District Attorney's office declined to go on record as admitting impropriety, let alone promising reform." *Id.* at 382.

268. Despite the *Warmus* Court's findings that the trial prosecutor violated three independent laws, he was not disciplined by the WCDA and maintained his position at WCDA through at least 2014.

269. Taken together, *Natal* and *Warmus* establish that, as of 1990 (while Mr. Koonce still had time to pursue a federal writ of habeas corpus challenging his conviction), there was no system of attorney training, supervision, or discipline in place at the WCDA.

270. Despite the numerous published and unpublished decisions before Mr. Koonce's wrongful conviction giving the WCDA notice of the need to investigate, supervise, and discipline prosecutors and investigators with respect to their *Brady* obligations and conduct, there is not a single public instance in which the WCDA directed any internal disciplinary investigation be conducted, let alone that any discipline be imposed for the suspect prosecutor.

271. To the contrary, the offending prosecutor almost invariably received positive evaluations, recommendations, promotions, and pay raises, despite the WCDA's knowledge that the prosecutor had been alleged or found to have engaged in such misconduct. In other cases, the WCDA ratified the misconduct by aggressively defending it even after it was exposed. Despite the judicial findings of misconduct detailed above, not once during WCDA Carl Vergari's administration did he ever terminate a prosecutor for prosecutorial misconduct.

272.    Upon information and belief, the WCDA's personnel files of the prosecutors in the cases listed above, where prosecutorial misconduct was found, reveal no documentary evidence of disciplinary action ever being taken against the prosecutors, no notations of their misconduct and no remedial action with respect to such conduct.

273.    Moreover, prosecutors who courts found to have committed misconduct were placed in supervisory and training positions over new ADAs, essentially ensuring that improper practices would be repeated.

274.    Further proof that, at the time of Mr. Koonce's prosecution, there was no system of attorney training, supervision, or discipline in place at the WCDA can be seen by the conduct of the two prosecutors involved in Mr. Koonce's case.

275.    Assistant District Attorney James H. O'Brien, then the Chief of the Mount Vernon Office of the WCDA, directed Defendants Garcia and Salottolo to present Mr. Koonce—who was under arrest—in a showup to a witness despite there being no exigency, in violation of well-settled law.

276.    Mr. O'Brien was not disciplined for this legally erroneous advice, despite the Court's finding that the hospital showup was impermissibly suggestive. Mr. O'Brien either remained in his position or was promoted until his retirement from WCDA in 1995.

277.    Nor was the trial prosecutor, ADA Mary Smith, disciplined or retrained, despite committing numerous summation errors during Mr. Koonce's trial. Instead, ADA Smith was promoted, eventually becoming a Senior ADA. Further, despite the WCDA's direct knowledge of ADA Smith's racial bias, the WCDA supported her efforts to become a judge.

278.    In 1998, Smith–then a Westchester County Court judge–received a formal censure from the New York State Commission on Judicial Conduct, after receiving numerous complaints about then-Judge Smith's conduct. The Commission sustained three separate charges of misconduct, each encompassing multiple instances of misconduct. Most relevant

here, the Commission found, between 1995 and 1997, Judge Smith made improper comments reflecting ethnic bias. These included generalizing from a criminal defendant to all members of their ethnic group, and commenting in chambers that alleged victims of a charged crime were probably "illegal aliens" who would not testify or be believed because of that status. The Commission found comments that indicate ethnic bias—or even simply appear to indicate such bias—are "undesirable, inappropriate and inexcusable." Separately, on two occasions between 1995 and 1997, Judge Smith initiated improper ex-parte communications with represented criminal defendants while their attorneys were out of the courtroom, attempting to persuade the defendants to plead guilty. In one case, she persisted in this conduct even after prosecutors objected and the defense attorney returned and told his client not to respond to the judge.

279.     In 2013, in a medical malpractice lawsuit Judge Smith presided over, the Appellate Division Second Department reversed the judgment and ordered a new trial before a different judge, finding Judge Smith deprived the plaintiff of a fair trial through "excessive intervention" and "improper conduct." Judge Smith repeatedly interrupted, patronized, and admonished the plaintiff's counsel in front of the jury, displayed a lack of impartiality, and made numerous injudicious remarks, including telling the plaintiff's counsel he was having "emotional tantrums" and acting like "a leech on a horse." *Porcelli v. Northern Westchester Hosp. Ctr.*, 110 A.D.3d 703, 977 N.Y.S.2d 32 (N.Y. App. Div. 2013).

280.     Nor are these the only indications that training, supervision, and discipline were lacking at the WCDA before, during, and after Mr. Koonce's prosecution.

281.     In 2007, the WCDA itself commissioned and published a report on the 1990 wrongful conviction of Jeffrey Deskovic, which identified "Police and Prosecutorial Failures" as a primary cause of the wrongful conviction. The Deskovic report found that the prosecution proceeded to the grand jury before receiving DNA results; advanced shifting and unsupported theories to explain away exculpatory DNA evidence; speculated during summation about

67

matters the prosecution knew to be false; and that the former District Attorney refused to run DNA through the CODIS database for years after conviction—conduct that the WCDA's own report characterized as systemic institutional failure requiring corrective reforms. The Deskovic report demonstrates that the County of Westchester had actual knowledge, no later than 2007 (at a time when the WCDA was continuing Mr. Koonce's malicious prosecution and due process violations by post-conviction suppression of evidence), of systemic prosecutorial failures within the WCDA, yet failed to implement reforms sufficient to prevent the continuation of the very practices that prevented Mr. Koonce's wrongful conviction from coming to light or being addressed before 2024.

282. Yet even as it published the Deskovic report, the WCDA failed to implement adequate systems for identifying and remediating tainted convictions, as demonstrated by the fact that discovery during Mr. Deskovic's federal civil rights lawsuit uncovered additional evidence of wrongdoing by the trial prosecutor, including conspiring with others to fabricate evidence to explain away exculpatory DNA evidence; knowingly eliciting and failing to correct false testimony; and knowingly advancing false and misleading arguments.

283. WCDA's failure to implement adequate systems for identifying and remediating tainted convictions continued after the issuance of the Deskovic report, as revealed by WCDA's handling of tainted DWI evidence in Westchester County that WCDA relied on to bring criminal prosecutions.

284. From at least 2014 to 2018, New York State Police troopers in Westchester gave Spanish-speaking motorists incorrectly translated refusal warnings that materially misrepresented the legal consequences of refusing a blood alcohol test, potentially coercing defendants into decisions that resulted in severe criminal consequences. WCDA prosecutors were alerted to the mistranslated warnings at least three times—in 2018, 2019, and 2021—yet

the office failed to investigate any of the prosecutors who based cases on such tainted evidence, or examine potentially affected cases.

285.   A senior WCDA assistant district attorney acknowledged in court that the translation issues were valid, yet no office-wide review was initiated. When the WCDA CRU eventually received a list of approximately 260 potentially affected arrests, upon information and belief, not a single prosecutor who relied on the questionable evidence was investigated or disciplined for doing so.

286.   Instead, the CRU reviewed only 44 of the 260 cases and substantially delayed notifying defense attorneys in the cases where tainted forms were confirmed. The WCDA's institutional response to the DWI episode—awareness of tainted evidence affecting criminal convictions, followed by years of inaction, and the failure to investigate or discipline—mirrors the deliberate indifference that characterized the office's handling of Mr. Koonce's wrongful conviction.

287.   The WCDA's deliberate indifference to the constitutional rights of criminal defendants can also be seen in the WCDA's uncritical acceptance and prosecution of cases presented by the MVPD, despite knowing of rampant corruption and misconduct within the MVPD as early as 1974, when WCDA publicly announced an investigation of allegations of corruption at MVPD.  The investigation was initiated and publicly announced, but no public conclusion or disciplinary action followed, as is clear from the Department of Justice's 2024 report. See supra ¶ 166.  Moreover, for decades after first becoming aware of corruption at the MVPD, and as additional evidence of systematic misconduct, including in the areas of eyewitness misidentification, evidence fabrication, and Brady violations mounted, WCDA continued to prosecute individuals and defend convictions resulting from MVPD's investigations. At no point did WCDA ever take any steps to ensure that cases brought by MVPD were not tainted by this systemic misconduct—not after the FBI's 1993 yearlong

investigation into corruption, the indictment and conviction by guilty plea of federal corruption felonies of Defendant Astorino, the chief of the MVPD detective unit, and two other detectives, including Defendant Garcia, and not after numerous findings by courts of misconduct. Nowhere is this more apparent than in the WCDA's decision in 1993 to prosecute a series of bank robberies after the Department of Justice declined to prosecute, having obtained evidence that Garcia and another detective had engaged in improper suggestion in an identification procedure and misrepresented the nature of the procedure. *See supra* ¶ 157.

288.   Despite the highly publicized arrests and convictions of Defendants Garcia, Astorino, and one other, the WCDA refused until 2024—thirty years after their convictions-- to reexamine those Defendant-Detectives' work. Instead, WCDA defended their convictions, demonstrating deliberate indifference to MVPD's misconduct and the possibility that convictions WCDA obtained as a result of these and other MVPD officers' work might have been based on false or fabricated evidence, the suppression of exculpatory evidence, false testimony, or other misconduct.

289.   Despite this documented pattern spanning decades—including published judicial opinions, civil rights complaints, the WCDA's own commissioned report identifying systemic failures, and repeated instances of failing to act on known tainted evidence and compromised law enforcement officers—the County of Westchester failed to implement adequate training, supervision, or disciplinary measures to ensure that assistant district attorneys complied with their constitutional obligations. The County's policies, customs, practices, and deliberate indifference directly, foreseeably, proximately, and substantially caused the violation of Mr. Koonce's constitutional rights.

290.   The prosecutorial misconduct in Mr. Koonce's case—including the direction of the suggestive hospital showup, the pervasive summation and other trial misconduct encompassing racially prejudicial statements, inflammatory appeals, vouching, facts not in

evidence, burden-shifting, and civic duty arguments as described above, the failure to correct false testimony, and the suppression of *Brady* material—was the foreseeable and direct result of the County's persistent failure to train, supervise, and discipline its prosecutors despite decades of documented misconduct. Mr. Koonce suffered the damages and injuries set forth above as a direct result.

## NINTH CAUSE OF ACTION

### 42 U.S.C. § 1983 — Municipal Liability (*Monell*)
*(Defendant County of Westchester; Delegated Policymaker's Direct Infliction Of Constitutional Injury)*

291.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth here and further alleges:

292.    At the time of Mr. Koonce's arrest, WCDA policymakers implemented and maintained a policy, custom, or practice intentionally designed to create and use, in criminal investigations and prosecutions, improper, illegal, and suggestive identification procedures designed to deprive criminal defendants of their constitutional rights to a fair trial and to be free from false arrest and malicious prosecution, among others.

293.    On or about June 20, 1981, Defendant Assistant District Attorney James O'Brien was the Chief of the Mount Vernon office of the WCDA, to whom District Attorney Carl A. Vergari had explicitly or implicitly delegated to O'Brien Vergari's final policymaking authority concerning (a) when to authorize showup identifications in Mount Vernon criminal investigations, (b) the conduct of showup identification procedures in Mount Vernon criminal investigations, and (c) identification procedures in Mount Vernon criminal investigations and prosecutions in general.

294.    Upon information and belief, District Attorney Vergari, by explicit delegation or customary office practice, granted O'Brien unconstrained, and unreviewed, discretion to direct, authorize, or approve decisions or actions with respect to the three above areas (*see* ¶

293), without meaningful review by Vergari or any other executive in the WCDA. For practical and legal purposes, O'Brien's decisions with respect to the three areas above was the final decision on the subjects.

295.    Accordingly, when O'Brien directed, authorized, or approved the illegal hospital showup, he was exercising this delegated final policymaking authority. His administrative determination that a one-on-one showup would be conducted despite their being no exigency whatsoever, and despite the availability of other witnesses to participate in proper, lawful, and non-suggestive identification procedures constituted the official policy of the District Attorney's Office and the City of New York for this case, directly causing the continuation of Plaintiff's false arrest, malicious prosecution and wrongful imprisonment.

296.    The acts of O'Brien was the "moving force" that continued Mr. Koonce's false arrest, malicious prosecution, and false imprisonment. The WCDA's official policy of directing, authorizing, and approving illegal, suggestive, and unconstitutional identifications.

297.    As a direct and proximate cause of O'Brien's actions, Mr. Koonce was deprived of his constitutional rights, wrongly convicted, and imprisoned for approximately ten years, and suffered the other grievous damages and injuries set forth above.

### EIGHTH CAUSE OF ACTION
### 42 U.S.C. § 1983 — Municipal Liability (*Monell*)
*(Defendant City of Mount Vernon)*

298.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth here.

299.    At all times relevant to this Complaint, the Chief of Police and/or Commissioner of the MVPD—including Anthony M. Mosca during the period of Mr. Koonce's investigation, arrest, and prosecution—held final policymaking authority over the MVPD's training, supervision, discipline, and operational policies with respect to criminal investigations, identification procedures, evidence handling, and officer conduct. The Mayor and City Council

of Mount Vernon held final policymaking authority over the resources, oversight, and accountability mechanisms available to the MVPD, but for practical and legal purposes, delegated the day to day operations of the MVPD to the Commissioner.

300. Under the Commissioner, the City of Mount Vernon, through the MVPD, maintained policies, customs, and/or practices of permitting its officers to fabricate evidence, employ suggestive and unreliable identification procedures, withhold exculpatory evidence, give false testimony, use excessive force, conduct unlawful searches, and make arrests without probable cause. These customs and practices were so persistent and widespread as to constitute the standard operating procedure of the MVPD.

301. The Commissioner, Mayor, and City Council, had actual notice of these customs and practices through, inter alia, the cases, incidents, lawsuits, judicial findings, and investigations set forth in the preceding paragraphs, which placed the City on notice that MVPD officers were engaging in a persistent pattern of fabricating evidence, giving false testimony, using excessive force, conducting unlawful searches, and violating the constitutional rights of individuals.

302. These cases, incidents, and findings—spanning from 1974 through 2024, more than five decades, and encompassing at least nineteen separate lawsuits, investigations, and judicial findings—involve officers across every rank of the department, from patrol officers through the chief of detectives. The persistence of the same categories of misconduct— evidence fabrication, suggestive identification procedures, false testimony, excessive force, unlawful strip searches, planting of drugs, and racially discriminatory policing—across multiple generations of MVPD officers demonstrates that the City's failures were institutional, not isolated.

303. Despite this accumulating evidence of systemic constitutional violations spanning more than five decades, the City of Mount Vernon failed to train, supervise, or

discipline its officers to prevent such conduct. The DOJ's investigation confirmed that, as of 2024, the MVPD *still lacked* basic operational procedures explaining what constitutes an arrest or when probable cause exists; had no adequate training on constitutional requirements for stops, searches, or identifications; assigned inexperienced officers to train new officers; permitted supervisors to review use-of-force incidents in which they were personally involved; and imposed discipline in only eight percent of misconduct cases—with no terminations. The absence of these basic institutional safeguards as of 2024 confirms that they were also absent during the period of Mr. Koonce's investigation and prosecution in the early 1980s, when the same categories of constitutional violations—fabricated identification evidence, suppression of exculpatory material, and false testimony—were committed against him.

304.    The City's failure to act was not passive neglect but active ratification. The City permitted Garcia and Astorino to continue investigating and testifying in criminal cases for years after the Taylor settlement and the Nicholas findings. After their federal convictions, the City failed to review or flag any of their prior cases, including Mr. Koonce's. When the narcotics unit's corruption was exposed through Officer Bovell's recordings, the City dissolved the unit but then reconstituted it under a different name using the same plainclothes-policing model. Internal Affairs investigations were so inadequate that the DOJ found investigators "frequently failed to complete basic steps," including failing to interview complainants, civilian witnesses, or the officers themselves.

305.    The deficiencies identified by the DOJ in 2024 mirrored the deficiencies that were present in the MVPD in 1981 when Mr. Koonce was arrested, and throughout the period when he was prosecuted and the MVPD and WCDA continued to coverup his wrongful conviction.

306.    The City's *Monell* liability is further established by its failure to investigate and implement corrective measures in response to lawsuits and judicial findings placing it on notice of constitutional violations.

307.    After James Taylor filed a federal civil rights action alleging that Garcia used suggestive identification procedures identical to those used against Mr. Koonce—resulting in a $25,000 verdict—the City failed to investigate whether Garcia had used the same methods in other cases, failed to review Garcia's prior investigations, and failed to implement any training or policy changes regarding identification procedures. This failure to investigate lawsuits and implement corrective measures constitutes an independent basis for *Monell* liability. *See Buari v. City of New York*, 530 F.Supp.3d 356, 398 (S.D.N.Y. 2021); Joanna C. Schwartz, *Monell's Untapped Potential*, 125 Columbia L. Rev. 925 (2025).

308.    The City's policies, customs, practices, and deliberate indifference—spanning from the 1974 gambling graft investigation through the 2024 DOJ findings—directly, foreseeably, proximately, and substantially caused the violation of Mr. Koonce's constitutional rights. The misconduct in Mr. Koonce's case—fabricated identification evidence, suppressed exculpatory material, fabricated inculpatory statements, and false testimony—was the foreseeable and direct result of the City's persistent failure to train, supervise, and discipline its officers despite decades of documented constitutional violations. Mr. Koonce suffered the damages and injuries set forth above as a direct result.

## TENTH CAUSE OF ACTION

### 42 U.S.C. § 1983 — Supervisory Liability
*(Defendants Astorino, John Doe 11, as Administrator of the Estate of Anthony M. Mosca, and John Doe 12)*

309.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth here and further alleges:

310. At all times relevant to this Complaint, Anthony M. Mosca (now deceased, sued through the administrator of his estate, John Doe 11) was the Chief of Police or Commissioner of the Mount Vernon Police Department and was the final supervisory authority over the MVPD's detective division. Defendant John Doe 12 was the direct or intermediate supervisor of Defendant Astorino within the detective unit, holding the rank of captain, lieutenant, or equivalent.

311. Mosca and John Doe 12 knew, or but for their grossly negligent and deliberate indifference should have known, that Detective Garcia had a pattern and practice of fabricating identification evidence, giving false testimony, and engaging in other acts of corruption. The supervisory Defendants were on notice of Garcia's misconduct through, *inter alia*: the circumstances surrounding Mr. Koonce's arrest in 1981, in which there was no documented basis for targeting Mr. Koonce; the 1984 Taylor case, in which Garcia used the same methods and a grand jury refused to indict; the 1990 judicial finding in *People v. Nicholas* that Garcia "intentionally told falsehoods"; other complaints and internal affairs matters within the knowledge of MVPD supervisory personnel; and their personal knowledge of Garcia's improper investigative practices.

312. Despite actual or constructive knowledge of Garcia's pattern of misconduct, Mosca and John Doe 12 failed to adequately supervise, discipline, retrain, reassign, or terminate Garcia. Instead, the supervisory Defendants permitted Garcia to continue investigating and testifying in criminal cases—including cases involving eyewitness identification evidence—without any corrective action. Mosca, during his tenure as MVPD Commissioner, was a municipal policymaker who presided over a "deplorable" departmental culture and who used Internal Affairs for personal retaliation rather than legitimate accountability. *See Annis v. County of Westchester*, 136 F.3d 239 (2d Cir. 1998).

313. The supervisory Defendants' failure to act was deliberately indifferent to the rights of individuals, including Mr. Koonce, who came into contact with Garcia and other officers under the supervisory Defendants' command. Similarly, the supervisory Defendants failed to adequately supervise Defendants Salottolo and Astorino, who participated in and facilitated Garcia's misconduct.

314. As a direct and proximate cause of Mosca's and John Doe 12's grossly negligent supervision and deliberate indifference to the misconduct of officers under their command, Mr. Koonce's constitutional rights were violated and he suffered the damages and injuries set forth above.

## ELEVENTH CAUSE OF ACTION

**Negligent Hiring, Training, Retention, and Supervision (State Law)**
*(Defendants City of Mount Vernon and County of Westchester)*

315. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth here and further alleges:

316. The City of Mount Vernon, as the employer of Defendants Garcia, Salottolo, Astorino, and the John Doe Defendants, owed a duty to Mr. Koonce and other members of the public to exercise reasonable care in the hiring, training, retention, supervision, and discipline of its police officers. The County of Westchester, as the employer of the assistant district attorneys who prosecuted Mr. Koonce, owed a similar duty with respect to its prosecutorial employees.

317. The City of Mount Vernon breached this duty by, inter alia: (a) failing to adequately train or discipline its officers on constitutional requirements for conducting identification procedures, including the dangers of suggestive photo arrays and one-on-one showups; (b) failing to adequately train its officers on their obligations to disclose exculpatory evidence; (c) retaining Detective Garcia despite accumulating evidence of his pattern of fabricating evidence and giving false testimony, including the Taylor civil rights settlement

and the judicial findings in *People v. Nicholas*; (d) failing to investigate or discipline Garcia following these incidents; (e) failing to review or flag cases investigated by Garcia and Astorino after their federal corruption convictions; and (f) failing to implement adequate internal affairs and disciplinary procedures, as confirmed by the 2024 DOJ findings that discipline was imposed in only eight percent of misconduct cases with no terminations.

318. The County of Westchester breached this duty by, inter alia: (a) failing to adequately train or discipline its assistant district attorneys on their *Brady* obligations and the constitutional requirements for fair trial procedures; (b) failing to train or discipline assistant district attorneys on the constitutional limits of summation advocacy, including the prohibitions on the categories of misconduct committed by the prosecutor in Mr. Koonce's case and documented across decades of WCDA cases as set forth above — namely, racially prejudicial arguments, inflammatory appeals to emotion, personal vouching for witness credibility, assertion of facts not in evidence, comments on a defendant's exercise of constitutional rights, and civic duty or golden rule arguments; (c) failing to supervise or discipline assistant district attorneys who engaged in the pattern of summation misconduct, *Brady* violations, and presentation of false testimony documented in the preceding paragraphs; and (d) failing to implement the reforms recommended by its own 2007 Deskovic report identifying systemic prosecutorial failures.

319. Defendants' negligent hiring, training, retention, and supervision was a proximate cause of the constitutional violations committed against Mr. Koonce. Had the City and County exercised reasonable care, the misconduct that led to Mr. Koonce's wrongful conviction would have been prevented.

320. As a direct and proximate cause of Defendants' negligence, Mr. Koonce was indicted, tried, wrongly convicted, and imprisoned for approximately ten years, and suffered the other grievous damages and injuries set forth above.

## TWELFTH CAUSE OF ACTION

### Malicious Prosecution (State Law)
*(Defendants Garcia, Salottolo, Astorino, and John Does 1–10)*

321. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth here and further alleges:

322. Defendants Garcia, Salottolo, and Astorino, with malice and knowing that probable cause did not exist to arrest Mr. Koonce and prosecute him for the armed robbery of the Vernon Stars Rod & Gun Club, acting individually and in concert, initiated and continued a criminal proceeding against Mr. Koonce by fabricating evidence and forwarding it to prosecutors, thereby creating false probable cause.

323. Probable cause did not exist because: (a) there was no documented investigative basis for targeting Mr. Koonce; (b) Mr. Koonce did not match the physical descriptions provided by eyewitnesses; (c) the sole eyewitness identification was the product of impermissibly suggestive procedures orchestrated by Defendants; (d) multiple eyewitnesses failed to identify Mr. Koonce; (e) Mr. Koonce had a corroborated alibi; and (f) the sole informant's statement was unreliable and the product of coercion.

324. Defendants not only initiated the criminal proceeding without probable cause but continued the prosecution by concealing the fabrication of evidence, the suggestiveness of the identification procedures, and the exculpatory material described above. This continued concealment prevented the discovery of the wrongful prosecution and perpetuated Mr. Koonce's incarceration.

325. Mr. Koonce is completely innocent. The prosecution terminated in his favor on December 23, 2024.

326. Defendants engaged in these acts within the scope of their employment.

327. As a direct and proximate cause of Defendants' actions, Mr. Koonce was indicted, tried, wrongly convicted, and imprisoned for approximately ten years, and suffered the other grievous damages and injuries set forth above.

## THIRTEENTH CAUSE OF ACTION

**Intentional, Reckless, or Negligent Infliction of Emotional Distress**
*(Defendants Garcia, Salottolo, Astorino, and John Does 1–10)*

328. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth here and further alleges:

329. The improper, deliberate, and traumatizing conduct of Defendants, as well as their conduct in deliberately causing, or recklessly disregarding the risk of causing, the wrongful prosecution, conviction, incarceration, and concomitant emotional damage, was extreme and outrageous, and directly and proximately caused the grievous injuries and damages set forth above.

330. In the alternative, Defendants negligently and grossly negligently, and in breach of their duties owed to Mr. Koonce to, inter alia, report accurately the information given by witnesses and the circumstances underlying such statements; refrain from conducting unduly suggestive identification procedures and report accurately what occurred during identification procedures; refrain from fabricating evidence and withholding material exculpatory and impeachment evidence; and otherwise acting to deny Mr. Koonce due process of law, directly and proximately caused Mr. Koonce, who was innocent, to be falsely arrested, maliciously prosecuted, and wrongly imprisoned for approximately nine years. Defendants' actions unreasonably endangered Mr. Koonce's physical and mental health and safety, and caused him to suffer physical harm and to fear for his physical safety throughout the period of his incarceration.

331. Defendants engaged in these acts within the scope of their employment.

332.    These claims are tolled as Defendants concealed from Mr. Koonce—and continued to conceal—their conduct giving rise to this cause of action.

## FOURTEENTH CAUSE OF ACTION

### Respondeat Superior
*(Defendants City of Mount Vernon and County of Westchester)*

333.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth here and further alleges:

334.    At all times relevant to this Complaint, Defendants Garcia, Salottolo, and Astorino acted as employees and agents of the City of Mount Vernon, in furtherance of the business, including law enforcement functions, of the City of Mount Vernon, and within the scope of their employment.

335.    At all times relevant to this Complaint, the assistant district attorneys who prosecuted Mr. Koonce acted as employees and agents of the County of Westchester, in furtherance of the business, including prosecutorial functions, of the County of Westchester, and within the scope of their employment.

336.    The conduct by which these agents committed the torts of malicious prosecution, intentional, reckless, or negligent infliction of emotional distress, negligence, and violation of the New York State Constitution was not undertaken for personal motives, but rather was undertaken while on duty, carrying out routine investigative and prosecutorial functions.

337.    Under the doctrine of respondeat superior, the City of Mount Vernon and the County of Westchester are liable for their agents' state law torts of malicious prosecution, negligent hiring, training, retention, and supervision, intentional, reckless, or negligent infliction of emotional distress, negligence, and violation of the New York State Constitution.

## FIFTEENTH CAUSE OF ACTION

### New York State Constitutional Due Process
*(Defendants City of Mount Vernon and County of Westchester)*

338. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth here and further alleges:

339. The New York State Constitution, Article I, § 6, provides that no person shall be deprived of life, liberty, or property without due process of law. The New York Court of Appeals has recognized a cause of action for violation of the state constitutional right to due process in the wrongful conviction context. See *Buari v. City of New York*, 530 F. Supp. 3d 356 (S.D.N.Y. 2021); *Bolt v. City of New York*, 2016 WL 3947882 (S.D.N.Y. 2016).

340. Defendants Garcia, Salottolo, Astorino, and John Does 1–10, acting within the scope of their employment, deprived Mr. Koonce of his right to due process under the New York State Constitution by fabricating evidence, suppressing material exculpatory and impeachment evidence, conducting impermissibly suggestive identification procedures, and initiating and continuing a criminal prosecution without probable cause, as more fully set forth in the preceding paragraphs.

341. The City of Mount Vernon and the County of Westchester are liable under respondeat superior for the state constitutional violations committed by their respective employees acting within the scope of their employment.

342. As a direct and proximate cause of Defendants' violation of Mr. Koonce's state constitutional due process rights, Mr. Koonce suffered the damages and injuries set forth above.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff hereby requests judgment against Defendants as follows:

(a)    That the Court award compensatory damages to Plaintiff and against the Defendants, jointly and severally, in an amount not less than $20,000,000;

(b)     For punitive damages against the individual Defendants in an amount sufficient to punish Defendants for their willful, wanton, and malicious conduct and to deter similar conduct in the future;

(c)     For a trial by jury;

(d)     For pre-judgment and post-judgment interest and recovery of costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

(e)     For any and all other relief to which the Plaintiff may be entitled.

Dated: New York, New York
       March 20, 2026

Respectfully submitted,

/s/ Karen A. Newirth

Karen A. Newirth
NEWIRTH LINEHAN PLLC
99 Park Avenue, PH
New York, New York 10016
(917) 426-5551
karen@newirthlinehan.com

*Counsel for Plaintiff Jeffrey Koonce*