# EXHIBIT C

U.S. DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK (WHITE PLAINS)

---------------------------------X

SMYTHE, :

:

v. :

7-16-CV-02451-cs

CITY OF YONKERS, et al, :

Defendant. :

---------------------------------X

United States Courthouse
White Plains, New York

JUNE 21, 2017

B e f o r e:

HON. CATHY SEIBEL
United States District Judge

A P P E A R A N C E S

SAMUEL MICHAEL BRAVERMAN

MICHAEL GIORDANO

Attorneys for the Plaintiff

RORY CARLETON McCORMICK

IRMA WHEATFIELD COSGRIFF

Attorney for Defendants

P R O C E E D I N G S

THE COURT: Mr. Braverman, Mr. Smythe, Mr. Giordano and Ms. Cosgriff, and Mr. McCormick. Have a seat.

(Reporter interruption.)

MS. COSGRIFF: Good morning, Your Honor.

THE COURT: I've spent some quality time with your large stack of motion papers.

Anything anybody wants to add before I rule if it's not covered by the papers?

MR. BRAVERMAN: Judge, nothing beyond, but we can answer any questions the Court may have.

MS. COSGRIFF: Same here, Your Honor.

MR. McCORMICK: I'm not a part of the motion.

THE COURT: That's right. It's Ms. Cosgriff's motion. It is a motion to dismiss by the following defendants: The County of Westchester, the Westchester Department of Corrections, and the Westchester County District Attorney's Office as well as Janet DiFiore in her official capacity as the former Westchester County district attorney.

I'm going to call the district attorney's office the DA's office. I'm going to call the department of corrections DOC. And I'm going to call the County, either the County or Westchester.

For purposes of the motion, I accept as true the facts, although not the conclusions, alleged in the amended

complaint, which I'm going to call the AC.

I summarize the facts as relevant to the instant motion:

On September 16, 2011, at about 6:00 p.m., the plaintiff, Jamar Smythe, drove a 2003 gray Infiniti into a parking lot near the intersection of Gray Place and Radford Street in the City of Yonkers. He alleges that he was at the parking lot to give his friend Jasmine Green a ride from Mr. Green's girlfriend's apartment in Yonkers to Mr. Green's grandmother's house in Peekskill. Once plaintiff was in the parking lot, Mr. Green approached plaintiff's vehicle, opened the passenger door, and put his bag and other belongings in the backseat. Mr. Green then began to get into the passenger seat of plaintiff's car.

Nonmoving defendants Christian Koch and Dennis Molina, who are detectives with the Yonkers Police Department, which I'm going to call the YPD, got out of an unmarked police car wearing plain clothes and without identifying themselves as police officers, they approached plaintiff's vehicle and ordered both Mr. Green and plaintiff not to move. Koch and Molina ordered plaintiff to turn off the engine of the vehicle and to put his hands on the steering wheel and ordered Mr. Green, who was outside of the vehicle, to put his hands on the hood of the vehicle. Plaintiff was then told to get out of the vehicle and put his hands on the hood as well, which he

did. Koch then handcuffed plaintiff. Without providing a reason, Koch and Molina then searched plaintiff's person and vehicle. The bag Mr. Green had put in plaintiff's vehicle was found to contain drugs.

Defendants YPD Detectives Michael Cassino, Michael Mueller, Vincent Starkey, and YPD Police Officers Sean Fogarty, Thomas Cleary, Robert Bock, Dennis Mullin, Thomas Braig, and other members of the YPD then arrived at the scene to assist Koch and Molina. Plaintiff alleges that these individuals questioned him and Mr. Green as to whether either owned the bag Mr. Green had put inside plaintiff's car. Mr. Green admitted that he was the sole owner of the bag. Mr. Green was handcuffed and placed inside a police vehicle parked at the scene.

Tyrone Hall, an individual who had been standing in the vicinity of plaintiff's vehicle during the incident, was also handcuffed, searched, and detained. Hall's person and his vehicle, a purple Mercedes parked at the scene, were searched by the defendants. Hall and Green were released without any further investigation, but plaintiff continued to be detained. In addition to Green and Hall, the YPD defendants interviewed several individuals who were present in the parking lot before and during plaintiff's arrival, including Shantel Crawford.

In the incident report about plaintiff's arrest, which is attached as Exhibit 1, Molina falsely claimed that he

and Koch were in the area where they arrested plaintiff due to numerous complaints of narcotics activity, that they stopped plaintiff's vehicle because they observed him commit a traffic violation for failing to signal, that Mueller and Starkey were present at the time plaintiff's vehicle was first approached and searched, that Starkey saw cocaine in plain view in plaintiff's vehicle and that, therefore, the search of the vehicle was justified by the plain view doctrine. The incident did not mention the presence of Mr. Green or Mr. Hall at the scene or the facts that they were handcuffed, questioned, and searched; did not mention Mr. Green's statements admitting ownership of the bag containing the drugs; and did not mention eyewitness statements regarding the events at issue.

On or about April 4, 2012, the DA's office held grand jury proceedings seeking an indictment against plaintiff relating to the events of September 16, 2011. The DA's office presented false testimony by Koch and Molina to the grand jury including the plaintiff was stopped because of a traffic infraction, that plaintiff was the owner of the bag found in his car, that there were narcotics in plain view in the car, and that plaintiff was the only suspect detained and searched at the time of his arrest. The DA's office did not present to the grand jury evidence that's exculpated plaintiff including that Green and Hall were also at the scene and that the bag containing the drugs belonged to Mr. Green.

On April 23, 2012, plaintiff was indicted for seven charges: Possession of a controlled substance in the first degree under Penal Law Section 220.21(01) for cocaine; three counts of possession of a controlled substance in the third degree under Penal Law Section 220.16(01) one each for cocaine, MDMA, and cocaine compounds; possession of a controlled substance in the fifth degree under Penal Law 220.06(1) for MDMA; possession of marijuana under Penal Law 221.05; and failure to signal under Vehicle and Traffic Law Section 1163(a).

On November 14, 2012, a suppression hearing was held in the state trial court to address plaintiff's motion to suppress the evidence seized from plaintiff's person and his vehicle. In preparation for the hearing, the DA's office interviewed members of the YPD. At the hearing, the DA's office presented Molina's false account of the events on September 16, 2011, including that the encounter with plaintiff had been completely unexpected and that plaintiff was the only suspect detained and searched in the vicinity of the drugs that were seized. The trial court denied plaintiff's motion to suppress the evidence, based on Molina's "credible evidence" that the drugs had been in plain view after Molina and Koch lawfully stopped plaintiff's vehicle for failing to signal, which the DA's office now concedes was false.

During plaintiff's criminal trial, through the

testimony of Molina, Koch, and other YPD members, the DA's office presented the same false and incomplete evidence used during the grand jury proceedings and the suppression hearing. During his trial, plaintiff called Mr. Green as a witness, who testified that the bag, a pair of jeans, and the narcotics found inside plaintiff's car belonged to him. Green further testified the plaintiff had no knowledge that Green had placed drugs in plaintiff's car.

I note that the trial testimony is under seal for some reason, but at this stage, perhaps -- well, I don't know why it's under seal. I guess because the conviction was ultimately vacated. But at this stage, I accept as true the factual assertions about Mr. Green's testimony.

On November 27, 2012, plaintiff was convicted of possession of a controlled substance in the first degree, three counts of possession of a controlled substance in the third degree, unlawful possession of marijuana and failing to signal. Based on the verdict sheet, which is attached as Exhibit 8, the jury didn't deliberate on the charge of possession in the fifth degree, but it's not clear to me how that count was resolved.

On April 2, 2013, plaintiff was sentenced to fifteen years imprisonment followed by five years of post-release supervision.

On April 15, 2013, he filed the timely appeal to the Appellate Division, Second Department. While the appeal was

pending, plaintiff's counsel contacted the DA's office requesting any evidence under *Brady v. Maryland*, 373 U.S. 83, not previously disclosed; and specifically a school calendar belonging to Mr. Green's daughter; and any other evidence of Mr. Green's presence inside plaintiff's vehicle on September 16, 2011. An assistant district attorney, or ADA, from the DA's office informed plaintiff that she had directed the YPD to check plaintiff's vehicle for the requested Brady material but none of the items sought had been found. Plaintiff's counsel then requested and received permission from the impound lot to search plaintiff's vehicle. Upon searching plaintiff's vehicle himself, plaintiff's counsel found Mr. Green's belongings including a toothbrush, underwear, a shirt, and Mr. Green's daughter's school calendar. Through a FOIA request, plaintiff's counsel also obtained documents alleged to show, in some unspecified way, that following addition exculpatory evidence had not been provided to the defense: One, the radio transmission report relating to the events of September 16, 2011, was altered and excised of unspecified material information; two, the traffic ticket presented as related to the alleged traffic infraction by plaintiff was not actually ever issued by the YPD and, therefore, was a false record; and, three, that the YPD had destroyed surveillance footage taken in the vicinity of the parking lot on the date in question.

On July 28, 2014, the DA's office notified plaintiff that in an unrelated matter, Koch had submitted an affidavit in support of a search warrant that was found to contain false statements. By letter dated October 27, 2014, the DA's office informed plaintiff that Koch had been arraigned on charges of perjury in the second degree and official misconduct. After receiving this letter, plaintiff's counsel asked the DA's office to review the record of plaintiff's suppression hearing and trial to determine whether Koch's testimony during those proceedings was also perjurious.

By letter dated April 3, 2015, based on a post-conviction review and an investigation by the DA's office into plaintiff's case, the DA's office informed plaintiff that they learned that the YPD did not unexpectedly encounter plaintiff's vehicle on September 16, 2011, as they had previously claimed in the grand jury at the suppression hearing and at trial. The letter indicated that the YPD had used a confidential informant, or CI, who provided information that led Koch and Molina to the vicinity where they saw and stopped plaintiff. The DA's office stated that when they asked the YPD if a CI was involved in plaintiff's case, the YPD affirmatively misrepresented that no CI was used. Based on this new evidence, the DA's office stated that they would agree to plaintiff's conviction being vacated.

On April 10, 2015, plaintiff's petitioned the state

trial court pursuant to Criminal Procedure Law Section 440.10 for an order vacating his convictions. On April 17, 2015, the DA's office joined the motion and requested that the convictions be vacated. On April 21, 2015, the motion was granted and plaintiff was ordered released from prison after over three and a half years of confinement, some of which was in Westchester County and some in New York State custody. On April 30, 2015, plaintiff renewed his request for Brady material in an effort to determine whether dismissal of the indictment would be warranted. Plaintiff did not receive a response to this request, but a week later, on May 7, 2015, the DA's office moved to dismiss plaintiff's indictment under CPL Section 210.2(1)(i) and Section 210.40. On May 12, 2015, the motion to dismiss the indictment was granted.

Now for the procedural background:

On April 4 of last year, plaintiff filed the original complaint in this case asserting 12 claims: For Constitutional violations under Section 1983 and specifically the 1st, 4th, 5th, 8th, and 14th Amendments; for false arrest and imprisonment; for malicious prosecution; for conspiracy; for denial of the constitutional right to a fair trial; for intentional infliction of emotional distress; for respondeat superior liability; for negligent hiring, training, and supervision; for municipal liability under Monell for the Constitutional violations; for assault and battery; for abuse

of process and failure to intervene; and for punitive damages. On August 24, a premotion conference was held at which defendants' potential motion to dismiss was discussed. On November 21, 2016, plaintiff filed the amended complaint, or AC. The AC alleges all the same claims as the original complaint except the negligent hiring, training, and supervision claim is no longer asserted and the six individual ADAs named the original complaint were dropped from the suit. On December 21, 2016, the City of Yonkers answered. And on February 17 of this year, Westchester County moved to dismiss.

The following claims are at issue on this motion:

Claim I, which is the 1983 claim alleging false arrest, unlawful search, and malicious prosecution as it relates to the County and the DA's office;

Claim II for false arrest and false imprisonment as it relates to the same two defendants;

Claim III, which is for malicious prosecution as it relates to the same two defendants;

Claim IV for conspiracy;

Claim V for denial of right to a fair trial;

Claim VI for intentional infliction of emotional distress, which I'm going to call IIED;

And Claim VII for respondeat superior liability all against the County and the DA's office;

Claim VIII, which is the Monell claim against the

County, the DA's office, and DiFiore;

Claim X, which is assault and battery against the DOC;

Claim XI, which is abusive process and failure to intervene as it relates to the County and the DA's office;

And Claim XII for punitive damages as to the County, the DA's office, and DiFiore.

It's a motion to dismiss, so the familiar plausibility standard of Ashcroft against Iqbal, 556 U.S. 662, and *Bell Atlantic vs. Twombly,* 550 U.S. 544 at 570, is what governs. I won't take the time to recite what those cases say.

First turning to whether the DA's office and DOC are sueable entities, the defendants assert that they're not. "Under New York law, departments which are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and cannot sue or be sued." *Hall v. City of White Plains,* 185 F. Supp. 2d 293 at 303, S.D.N.Y. 2002. Because the DOC and the DA's office are administrative arms of a municipality, the County of Westchester, they may not be sued. See *Perez vs. Ponte*, 2017 Westlaw 1047258, at page 24 note 16, E.D.N.Y. February 14, 2017, report and recommendation adopted, 2017 Westlaw 1050109, E.D.N.Y. March 15, 2017; *Jones v. Westchester County*, 182 F. Supp. 3d 134 at 140 note 1, S.D.N.Y. 2016; *Allyn v. Rockland County*, 2013 Westlaw 4038602, at page 2, S.D.N.Y. July 30,

2013, affirmed 646 Fed. Appendix 60; *Sulehria vs. City of New York*, 670 F. Supp. 2d at 325, S.D.N.Y. 2009; and *Steed v. Delohery*, 1998 Westlaw 440861, at page 1, S.D.N.Y. August 4, 1998. Accordingly, the motion to dismiss is granted with respect to the DOC and the DA's office.

Next turning to former District Attorney DiFiore, "Based on the understanding that it is duplicative to name both the government entity and the entity's employees in their official capacity, courts have routinely dismissed corresponding claims against individuals named in their official capacity as redundant and an inefficient use of judicial resources." *Stokes v. City of Mount Vernon*, 2012 Westlaw 3536461, at page 12, S.D.N.Y. August 14, 2012. Because Ms. DiFiore is "sued in her official capacity . . . the claims against her are duplicative of the Monell claim against" the County. *Tsotesi vs. Board of Education*, 258 F. Supp. 2d 336 at 338 note 10, S.D.N.Y. 2003, citing *Kentucky vs. Graham*, 473 U.S. 159 at 165 to -66; see *Conte vs. County of Nassau*, 2008 Westlaw 905879, at page 1 note 2, E.D.N.Y. March 31, 2008. Accordingly, the motion to dismiss is granted as to Ms. DiFiore and I, therefore, need not address the argument that she is entitled to 11th Amendment immunity.

Now getting down to the guts of the case, defendants first argue that the claim under Section 1983 for deprivation of civil rights should be dismissed as duplicative of the

Monell claim. Plaintiff does not address this argument in his opposition. A Monell claim is really a misnomer. Monell is not a claim in itself but a theory by which a municipality can be liable for Section 1983 violations committed by its employees. See *Askins vs. Doe*, 727 F.3d 248 at 253. To the extend plaintiff alleges both County liability under the Section 1983 claims, which are I and V, and a separate Monell claim as Claim VIII, the latter duplicates the former. Accordingly, the Monell claim is dismissed as against the County. I'll consider separately whether Monell provides a way to extend liability to Westchester for any 1983 violations by county employees. Likewise, respondeat superior is not a claim in itself but is a theory under which the County could be responsible for state law violations by its employees. See *Graham vs. City of New York*, 928 F. Supp. 2d 610 at 626, E.D.N.Y. 2013. See also *Scott vs. City of Mount Vernon* 2017 Westlaw 1194490, at page 25, S.D.N.Y. March 30, 2017, where the court pointed out that respondeat superior is a theory of liability not a freestanding cause of action. So because respondent superior is not a standalone claim, Claim VII is also dismissed.

Now, as to whether there should be Monell liability, "Congress did not intend municipalities to be held liable [under Section 1983] unless action pursuant to official municipal policy of some nature caused a constitutional tort."

That's Monell, 436 U.S. at 691. The case goes on to make clear that "it is only when execution of a government's policy or custom, whether made by its lawmakers or by those who edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under Section 1983." That's Monell at 694. Thus, "to prevail on a claim against a municipality under Section 1983 based on acts of a public official, a plaintiff is required to prove: One, actions taken under color of law; two, deprivation of a constitutional or statutory right; three, causation; four, damages; and, five, that an official policy of the municipality caused the constitutional injury." *Roe vs. City of Waterbury* 542 F.3d 31 at 36.

Contrary to defendant's suggestion in their memorandum of law at page 10 where they say, "The underlying conduct of the ADAs who prosecuted plaintiff's case are cloaked with absolute immunity. Any such immunity that would cover individual defendants does not shield Westchester County from suit." See Askins 727 F.3d at 254 and *Lore v. City of Syracuse*, 670 F.3d 127 at 164 where the court said, "Municipalities have no immunity from damages for liability flowing from their Constitutional violations." And that's quoting *Owen vs. City of Independence,* 445 U.S. 622 at 657. And I got to think a senior county attorney knows that. The parties do not contest that the relevant Westchester employees

were acting under color of state law. There's no immunity for the County, so, accordingly, I'm going to focus on the second, third, and fifth elements, specifically Constitutional violation, causation, and official policy.

First as to constitutional violation, to be liable under Section 1983, state actors must, obviously, deprive a plaintiff of a constitutional right. And if they do so, in certain circumstances, their municipal employer can be legally responsible for that deprivation. Here, plaintiff alleges, in Claim I, that the ADAs involved in his case deprived him of his 4th Amendment rights to be free of false arrest, malicious prosecution, and illegal search and seizure and, in Claim V, that they deprived him of his due process right to a fair trial. There's no factual allegation that any ADA was present for or involved in either the search of plaintiff's vehicle or his arrest, so I will consider only the malicious prosecution and fair trial claims. To state a malicious prosecution claim against a state actor, plaintiff must plausibly allege initiation of a criminal proceeding, termination in his favor, lack of probable cause, and malice. *Manginiello vs. City of New York*, 612 F.3d 149 at 161. A deprivation of a fair trial claim requires showing that the defendant fabricated evidence likely to influence the jury and plaintiff suffered a deprivation of liberty as a result. *Jovanovic vs. City of New York,* 486 Fed. Appendix 149 at 152.

The gist of the allegations is that the YPD falsified evidence against plaintiff and that the ADAs, one, presented it to the grand jury to the state judge on the motion to suppress and at trial and, two, did not present or reveal to plaintiff other evidence that would have exculpated him. Plaintiff alleges that the ADAs did all of this knowingly or with conscious disregard of their duty to ascertain the truth and seek justice. See, for example, paragraphs 45 through 47, 54, 55, 58, 59, and 131 of the AC. But the AC's allegations in this regard are entirely conclusory. For example, plaintiff alleges, in paragraph 46, that the DA's office knew the radio report was altered, the traffic ticket was false, there may have been video footage, and that Green's possessions were in plaintiff's car, but it presents no facts rendering that conclusion plausible. The AC further alleges that the DA's office failed to present to the grand jury exculpatory testimony of which they were aware, but the only fact asserted as demonstrating this alleged awareness is that an ADA asked defense counsel for the name and contact information of a witness defense counsel said would exculpate plaintiff. There is no allegation that that information was provided and no fact plausibly suggesting that the ADAs knew of other witnesses.

In any event, even assuming the prosecutors knew who the witness was and were able to locate him and assuming he was willing to testify, none of which is alleged, prosecutors have

no constitutional obligation to present exculpatory evidence to the grand jury. See *United States v. Williams*, 504 U.S. 36 at 52, *United States v. Regan*, 103 F.3d 1072 at 1081.

It is clear that the ADAs were aware of the exculpatory testimony related to Mr. Green at least during the trial when Mr. Green testified that the drugs were his and plaintiff did not know about them. There is no Brady violation alleged as to Green because obviously plaintiff and plaintiff's counsel were aware of him. But, in any event, prosecutors are not constitutionally obligated to disbelieve their witnesses and believe defense witnesses. Cf. *Panetta vs. Crowley*, 460 F.3d 388, 395 to -96 where the court said, "An officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause"; *Ricciuti vs. New York City Transit Authority,* 124 F.3d 123 at 128 where the court said -- by "court," I mean Second Circuit -- said the police officers could rely on the victim's account and were not required to investigate "explore and eliminate every theoretically plausible claim of innocence before making an arrest"; *Crews vs. County of Nassau,* 996 F. Supp. 2d 186 at 205, E.D.N.Y. 2014 where the district court said, "The Second Circuit has held consistently that conflicting accounts of a crime do not vitiate the probable cause established by an eye witness identification or alleged victim of a crime"; *Little vs. City of New York,* 487 F. Supp. 2d 426 at 439, S.D.N.Y. 2007

where the district court said, "It is well settled that police officers have probable cause to arrest if they receive information from a complaining victim or other witness who they reasonably believe to be telling the truth." It simply does not rise to the level of constitutional misconduct for prosecutors to pursue a case after a defendant presents an exculpatory witness. Were the law otherwise, prosecutors would be required to drop a case anytime a defense witness contradicted the prosecution's case.

Without a plausible allegation that the ADAs knew or should have known that the police were lying and Green was telling the truth, the mere fact of the conflicting testimony does not suffice to render the claims plausible. Malicious prosecution requires a plausible showing of malice. While lack of probable cause can suffice to raise an inference of malice, see *Lowth vs. Town of Cheektowaga,* 82 F.3d 563 at 573, it does not necessarily do so. Again, Lowth at 573. Based on the facts known to the ADAs, specifically the information provided by the YPD, there was probable cause. See *Devenpeck vs. Alfred,* 543 U.S. 146 at 153 where the Supreme Court said the existence of probable cause is determined based on the facts known to the defendant. So one cannot infer -- because, based on the facts known to the ADAs, there was probable cause, one cannot infer that the ADAs acted with wrong or improper motive. See Devenpeck at 153. Likewise, where there's no plausible

allegation that the ADAs knew the information they were presenting was false, it cannot be said that they fabricated anything or caused plaintiff's deprivation of liberty.

To be sure, the AC alleges that the ADAs knew the YPD officers were lying about several things, including Green's presence when plaintiff was stopped, Green's admission to owning the bag where the drugs were found, the police having interviewed several eye witnesses and having detained Green and Hall. But while the AC plausibly alleges that those things were true or did occur, it does not plausibly allege that the ADAs knew or should have known they were true or had occurred or knew or should have known that the police were lying about or concealing them. There is simply no facts rendering such collusions plausible. To the contrary, the AC tells a sordid tale of misconduct by the YPD that the ADAs did not uncover until after plaintiff's conviction and describes the ADAs doing their constitutional duty once the facts came to light.

Under Iqbal and Twombly, facts allowing for the possibility of liability are insufficient. *Berrio vs. City of New York,* 2017 Westlaw 118024 at page 2, S.D.N.Y. January 10, 2017, where the court said, "Plaintiff must allege sufficient facts to show more than a sheer possibility that a defendant has acted unlawfully, and accordingly, where the plaintiff alleges facts that are merely consistent with defendant's liability, it stops short of the line between possibility and

plausibility of entitlement to relief." And they're, I'm pretty sure, quoting Iqbal. Or Twombly. Actually, I think it's Twombly, which at 550 U.S. 570 says that a complaint has to nudge -- has to provide facts nudging the allocations across the line from the conceivable to the plausible. Here, the AC falls short as far as the DA's office is concerned.

Plaintiff does not really make a serious attempt to argue that the ADAs knew the police were lying to them or withholding Brady information, instead relying on cases to affect that Brady material in the possession of members of the prosecution team, such as the police, is imputed to the prosecutors. These cases are all criminal or habeas cases. There is a good rationale for concluding that the conviction of a defendant whose due process rights have been violated by the withholding of Brady material during the course of his prosecution is equally invalid whether that withholding results from the prosecutor's failure or the failure of others like the police who are members of the prosecution team. But no such imputation makes sense in the context of Section 1983 where liability is based on individual fault and personal involvement, and in some cases, employer liability where the individuals committing the violation do so pursuant to custom or policy. It is thus surprise that plaintiff has supplied no case authority for the proposition that unwitting individuals can be liable under Section 1983 for misconduct on the part of

codefendants, even if they were at one point members of the same prosecution team. In other words, that the fault of the police may be attributed to the prosecutors for purposes of plaintiff's criminal case does not mean that the same holds true for a 1983 case. See *Porter vs. White,* 483 F.3d 1294 at 1308, 11th Circuit 2007 where the court found negligent or inadvertent failure to turn over Brady material to be insufficient for 1983 liability. See also *Tennison vs. City and County of San Francisco,* 570 F.3d 1078 at 1088, 9th Circuit 2009 which said a 1983 plaintiff has to show deliberate indifference to or reckless disregard of the accused's rights on the part of the defendants. Even those cases that do not require bad faith, see, e.g., *Moldowan vs. County of Warren*, 578 F.3d 351 at 383, 6th Circuit 2009 recognized that the defendant has to be aware of the withheld evidence. Where, as here, there is no plausible allegation that the ADAs knew or should have known of the existence of the alleged exculpatory evidence or the alleged falsified evidence, it is difficult to see how they or their employer derivatively can be responsible under 1983 for failing to turn it over. In short, the AC alleges plausible claims for malicious prosecution and deprivation of the right to a fair trial but not on the part of the ADAs and, therefore, not on the part of the Westchester County.

But assuming, for the sake of argument, that a

Constitutional violation on the part of the ADAs or the DA's office was plausibly alleged, the County -- the claim fails against the County on the next prong -- on the next prongs which are policy and causation.

"An act performed pursuant to a 'custom' that has not been formally approved by an appropriate decision maker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." *Board of County Commissioners vs. Brown,* 520 U.S. 397 at 404. Monell's reach, therefore, goes beyond unconstitutional policies that have been formally endorsed by the municipality and includes "instances where a municipality's knowledge of and support for its officers' unconstitutional conduct can be inferred from its failure to curtail that conduct." *MacIssac vs. Town of Poughkeepsie,* 770 F. Supp. 2d 587 at 597, S.D.N.Y. 2011. A custom or policy cannot, however, be shown "by pointing to a single instance of unconstitutional conduct by a mere employee." *Newton vs. City of New York,* 566 F. Supp. 2d 256 at 271; see *Brogdon vs. City of New Rochelle,* 200 F. Supp. 2d, S.D.N.Y. 2002 where the court said, "A single incident by itself is generally insufficient to establish the affirmative link between the municipal policy or custom and the alleged unConstitutional violation."

Plaintiff asserts that, through policymaker DiFiore, the former district attorney, the County had a policy or

practice of failing to ensure or being deliberately indifferent to a criminal defendant's right to a fair trial by not disclosing information favorable to criminal defendants as required by Brady and by not insuring defendants were not convicted based on false testimony. That's in paragraphs 148 and 161 of the AC. Specifically, plaintiff advances three theories of liability to satisfy the policy prong: That Westchester, one, did not enact a "procedure that was constitutionally adequate" to "ensure its employees would understand and be able to satisfy their obligations" under Brady -- that's paragraphs 156 and 158 -- which I construe as a policy of failing to train; two, did "not discipline employees who violated the constitutional rights of criminal defendants" by committing Brady violations, see paragraphs 151 and 165; and, three, "conducted inadequate investigations into the veracity of witnesses known to lack credibility and who had a history of making false statements." That's paragraph 162.

The defendants don't argue that Ms. DiFiore was not a policymaker for purposes of this analysis. And "Under New York law, DAs and ADAs are generally presumed to be County officers not state officers." *Myers vs. County of Orange,* 157 F.3d 66 at 76. And so, "Where a DA acts as the manager of the DA's office, the DA acts as a county policymaker." *Frank vs. Relin,* 1 F.3d 1317 at 1327.

So turning first to the failure to train theory, "In

City of Canton, *Ohio, vs. Harris,* the Supreme Court established that a municipality can be liable for failing to train its employees where it acts with deliberate indifference in disregarding the risk that its employees will unconstitutionally apply its policies without more training." That's *Amnesty America vs. Town of West Hartford,* 361 F.3d 113 at 129. But failure to train is a narrow basis of liability and "a municipality's culpability is at its most tenuous where a claim turns on failure to train." *Connick v. Thompson*, 563 U.S. 51 at 61; see Tuttle, 471 U.S. 822 to -23. To satisfy the statute, the failure to train employees in a relevant respect must amount to "deliberate indifference to the rights of persons with whom the untrained employees come into contact." Canton at 388. Only then "can such a shortcoming be properly thought of as a 'policy or custom' actionable under 1983." Canton at 389; Connick at 61.

"Deliberate indifference is a stringent standard of fault requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Brown 520 U.S. at 410. Thus, when a county policymaker is on actual or constructive notice that a particular omission in their training program causes county employees to violate citizens' Constitutional rights, the county may be deemed deliberately indifferent if the policymaker chooses to retain that program. Brown at 407. A county's "policy of inaction" in light of

notice that its program will cause constitutional Constitutional violations "is the functional equivalent of a decision by the county itself to violate the Constitution." Canton at 395 which is Justice O'Connor concurring in part and dissenting in part. A less stringent standard of fault for a failure to train claim "would result in de facto respondeat superior liability for municipalities." Canton at 392; see Connick at 62.

In our Circuit, to demonstrate deliberate indifference, a plaintiff must establish, one, that a policymaker knows to a "moral certainty" that the municipality's employees will confront a certain situation; two, that that situation presents the employee with either a difficult choice of the type that training or supervision will make less difficult or that there is a history of municipal employees improperly handling the situation; and, three, that the wrong choice by the municipal employee will often cause the deprivation of an individual's Constitutional rights. See *Walker vs. City of New York,* 974 Fed.2d 293 at 297 to -98. A plaintiff must also identify "a specific deficiency in the training program and establish that that deficiency is closely related to the ultimate injury such that it actually caused the constitutional deprivation." Amnesty America, 361 F.3d at 129 quoting Canton at 391. In other words, the plaintiff must demonstrate that the municipal employee's "shortcomings

resulted from a faulty training program rather than from the negligent administration of a sound program or other unrelated circumstances." Amnesty America at 129 to 130; see *Okin vs. Village of Cornwall on Hudson,* 577 F.3d 415 at 440 to -41. "The elements of an identified training deficiency and close causal relationship, which together require the plaintiff to prove that the deprivation occurred as the result of the municipal policy rather than as the result of isolated misconduct by a single actor, ensure that a failure to train does not collapse into respondeat superior liability." Amnesty America at 130.

"A pattern of similar Constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Connick at 62 quoting Brown at 409. "Failure to train prosecutors in their Brady obligations does not fall within the narrow range" of claims that do not require a pattern of violations to establish deliberate indifference. Connick at 64. Without notice that a course of training is deficient in a particular respect, decision makers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights. Connick at 62. In addition, because prosecutors are equipped with years of extensive legal training both in and out of law school, "recurring constitutional violations are not the 'obvious

consequence' of failing to provide prosecutors with formal in-house training" regarding Brady compliance. Connick at 66.

Here, first, the failure-to-train claim fails because plaintiff has not plausibly alleged a specific deficiency in the municipality's training. *Tieman vs. City of Newburgh,* 2015 Westlaw 1379652 at pages 22 to 23, S.D.N.Y. March 26, 2015. Paragraph -- excuse me -- amended compliant -- the amended complaint alleges, in Exhibit 17, that the DA's office does not maintain "discovery and disclosure policy" because "such matters are generally covered by statute and related case law." That allegation does not suffice because the absence of a written policy does not equate to a failure to train, the reason there is no written policy makes sense, and as the Supreme Court noted in Connick at 64 to 66, ADAs are trained in law and the lack of formal training does not prevent them from knowing their Brady obligations, so a written policy likewise is not required.

Apart from that, as noted earlier, here there is no plausible allegation that the Brady material was not turned over because of a misinterpretation of the prosecutors' obligations under Brady. Plaintiff asserts that the "DA's Brady policy was constitutionally inadequate and prone to be applied with error." That's AC paragraph 159. But in this case, the prosecutors appear to have applied Brady properly by informing plaintiff as soon as they learned of the new

evidence. In contrast to the cases relied on by plaintiff, here the YPD is alleged to have lied to the DA's office and there is no indication that County or its employees knew about, let alone attempted to suppress, the Brady material. But even if there were a Brady violation, plaintiff cites only three cases spanning a seven-year period, from the years 2004, 2006, and 2011 respectively, as evidence of a Westchester County policy of prosecutors failing to adhere to the requirements of Brady due to failure to train. That's in paragraphs 150 to 155.

Let me digress for a moment by way of a footnote to note that defendants argue that the cases cited by the plaintiff can't form the basis for Monell liability because "although the court can take judicial notice of filings in other courts, it can do so only to acknowledge the existence of a lawsuit or the filing, not for the truth of the matters asserted in those claims."

The defendants make that argument at paragraph 19. The cases the defendants rely on for this proposition are at a different procedural stage, however, summary judgment, and therefore inapplicable. At the motion to dismiss stage, "the fact the pleadings may rely on hearsay does not warrant dismissal." *Connolly vs. Wood-Smith,* 2012 Westlaw 7809099 at page 6, S.D.N.Y. May 14, 2012, report and recommendation adopted as modified, 2013 Westlaw 1285168, S.D.N.Y. March 28,

2013; see *Sletten vs. LiquidHub,* 2014 Westlaw 3388866 at page 10, S.D.N.Y. July 11, 2014, where the court said "plaintiff may meet his initial pleading burden through the use of hearsay." Where, as here, plaintiff asserts only allegations, such allegations may be insufficient to show a widespread custom. *McClennon vs. City of New York*, 171 F. Supp. 3d 69 at 96, E.D.N.Y. 2016; and Tieman, 2015 Westlaw 1379652 at 17. But such allegations can plausibly show the need for training was obvious. See Tieman at 17 and 20.

But because the incidents advanced by plaintiff are not similar to the violations at issue here, they could not have put DiFiore on notation that specific training was necessary to avoid the Constitutional violation. Connick at 63.

Further, "Even if the allegations in these civil suits bore substantial similarities to this case and constituted examples of the alleged customs or policies the plaintiff identifies (something which the amended complaint has not demonstrated), these isolated instances spanning [nearly] a decade would still be insufficient to plausibly allege a pervasive custom, practice or policy." *Means vs. City of New York,* 2016 Westlaw 1337278 at page 5, S.D.N.Y. April 5, 2016, which involved 13 civil suits over a ten-year period going back to 2003; see Connick at 62 to 63 where the Supreme Court said that four reversals could not have put the DA on

notice that the Brady training was inadequate with respect to the sort of Brady violation at issue in that case because none of them involved failure to disclose physical or scientific evidence; *An vs. City of New York,* 2017 Westlaw 455434 at page 4, S.D.N.Y. February 2, 2017, where six lawsuits and one newspaper article over four years was insufficient to plausibly allege that the need for training was obvious. Accordingly, plaintiff has not sufficiently alleged that DiFiore was "deliberately indifferent" to the consequences of not having a Brady policy or providing better training to prosecutors, let alone that there was a policy of failing to train "so persistent and widespread as to practically have the force of law." Connick at 61.

In addition, the Monell claim premised on failure to train fails because there is no connection pleaded between the failure to train and plaintiff's injuries. Merely showing "that additional training would have been helpful in making difficult decisions does not establish municipal liability." Connick at 68; Canton at 391. Given that the YPD allegedly lied to the DAs, it's not plausible that better training on Brady would have prevented the alleged injuries to plaintiff. Therefore, plaintiff has not sufficiently shown a causal connection between a policy and his injuries. Therefore, the Monell claim based on failure to train is dismissed against the County.

Now turning to failure to discipline, plaintiff presents a list of cases involving instances that he alleges demonstrate a pattern of not disciplining employees who violated the Constitutional rights of criminal defendants by eliciting false testimony and by failing to properly examine the veracity of testifying witnesses known to lack credibility. That's paragraph 166 of the AC. The three cases and two newspaper articles that plaintiff cites to support this allegation in paragraphs 172 to -73 involve the YPD Detectives Koch and Molina. Neither is a Westchester employee. They are defendants in this case, but the similarities end there. None of the cases are factually similar to the plaintiff's. They instead involve claims that Koch and Molina used excessive force without legal justification. None of the cases involve a Westchester employee or prosecutor "eliciting false testimony to secure a conviction." The cases therefore cannot form the basis of a Monell claim. See *Dockery vs. Tucker,* 2006 Westlaw 5893295 at pages 23 to 24, E.D.N.Y. September 6, 2016, where the plaintiff failed to state a Monell claim where the plaintiff gave a "catalog of disquieting events" that "bore no resemblance to the allegations in the plaintiff's case." In addition, plaintiff offers no facts supporting the proposition that any county employees involved in the cases cited did something wrong such as knowingly or recklessly eliciting false testimony but were not disciplined. Accordingly, the Monell

claims based on a failure to discipline theory is wholly conclusory and fails to plausibly support a claim against the County.

And the third theory is failure to investigate. Plaintiff states, in paragraph 161, in conclusory fashion, that there was a "policy, practice and custom of conducting inadequate investigations into the reliability and veracity of its witnesses to ensure that criminal defendants receive a fair trial under due process of law by not being convicted based upon knowingly false testimony." Plaintiff has not provided any facts that would render the allegation that there us a municipal policy of failing to investigate plausible. In addition, there is evidence that in preparation for the suppression hearing, the DA met with the YPD and were presumably lied to, at least by omission, and the Brady material was withheld from them. See paragraph 53. Upon receiving plaintiff's request for Brady materials, the ADA asked the YPD about the items in plaintiff's vehicle and about the use of a CI and they were lied to in response.

Plaintiff in his opposition lists complaints to the DA's office that, according to plaintiff, were not addressed. A plaintiff cannot amend his complaint through his opposition papers. See *Gillmore vs. Rivera,* 2014 Westlaw 1998227 at page 5, S.D.N.Y. May 14, 2014; *Aniero Concrete vs. New York City*, 2000 Westlaw 863208 at page 31, S.D.N.Y. June 27, 2000.

But even taking these six complaints into account, the claim is insufficiently pleaded.

"Contemporaneous or subsequent conduct can't establish a pattern of violations that would give notice to the county and the opportunity to conform constitutional dictates." Connick at 63, note 7; see O'Neal 196 F. Supp. 3d at 435 where a motion to dismiss was granted where the complaint listed 26 court decisions allegedly showing that the New York County DA's office had a policy had a policy or custom of deliberate indifference to Constitutional violations, particularly Brady violations, but almost all of the decisions were decided after the events affecting plaintiff and thus plaintiff could not rely on them to plead that city had notice. Therefore, in this case, the testimony of exoneree Jeffrey Deskovic, to which the plaintiff's point, that was given in January 2016 is not helpful because it would not have provided notice to Ms. DiFiore and, therefore, the county that there us a pattern of Brady violations during the period when the events relevant to this suit occurred. In addition, Deskovic's testimony is not helpful because it focuses on the misconduct of a medical examiner. That is not remotely close to the types of misconduct alleged in this case. See 170 to -71. One other instance in plaintiff's brief also arose after his conviction.

In any event, "Other than the plaintiff's own conclusory assertions, there is nothing to suggest that any of

these alleged incidents was factually similar to the present case; that any of the complaints were substantiated or even advanced past the notice of claim stage; or that any of them can be plausibly connected to the alleged deprivation of plaintiff's Constitutional rights in this case." *Stratakos vs. Nassau County,* 2016 Westlaw 6902143 at page 5, E.D.N.Y. November 23, 2016.

The fact that several complaints were filed is not in itself sufficient. See *Ferreira vs. City of Binghamton,* 2016 Westlaw 3129224 at page 8, N.D.N.Y. June 2, 2016; *Woodhouse vs. City of Mount Vernon,* 2016 Westlaw 354896 at page 7, S.D.N.Y. January 27, 2016, both of which said repeated complaints is not sufficient to show widespread custom. The number of complaints -- now this is Woodhouse. "The number of complaints filed, without more, indicates nothing, as people may file a complaint for many reasons, or for no reason at all." And also see Tieman at page 17 where the court noted that even if the civil complaints involved comparable conduct, none resulted in an adjudication of liability. And *Petrillo vs. City of Philadelphia,* 1997 Westlaw 363844 at page 4, E.D.P.A. June 16, 1997, where the plaintiffs citation to civil rights cases filed against the county didn't demonstrate any actual wrongdoing or awareness on the part of policymakers of systemic wrongdoing.

In addition, the facts underlying the six complaints are dissimilar from those here and, therefore, would not have

raised a red flag about the type of misconduct alleged by plaintiff. See *Collins vs. City of New York,* 923 F. Supp. 2d 462 at 479, E.D.N.Y. 2013 and *Hernandez vs. City of Napa*, 781 F. Supp. 2d 975 at 1002, Northern District of California 2011. Four of the incidents involved alleged unlawful searches, one involves an alleged unlawful arrest, and the last one involves an alleged assault. Importantly, plaintiff has not provided sufficient information to ascertain whether any of the complaints cited involved any of the individual defendants to this suit or whether the district attorney's office knowingly relied on false testimony or -- hold on that makes no sense. Aside from the complaints being dissimilar, the plaintiff hasn't provided information suggesting that any of the complaints cited involved any of the individual defendants to this suit or the DA's office knowingly relying on false testimony or withholding Brady. The DA's handling of plaintiff's Brady requests and its investigation into plaintiff's case that led to the vacatur of plaintiff's convictions indicates that the DA's office, at least in this case, adequately invested [sic] complaints of wrongdoing by the YPD. There is also no evidence that Westchester could have taken any remedial action to change the behavior of the YPD officers complained of in the cases plaintiff refers to, so referring those cases to the Internal Affairs Bureau of the YPD seems like an appropriate response on the County's part.

Finally, one of the complainants indicated that he or she was satisfied with the DA's response to the complaint which belies the argument that there was a policy of failing to respond or investigate.

Therefore, even taking into account the complaints listed in plaintiff's brief at page 21, the "allegation of custom or policy is conclusory, and he alleges no facts connecting the supposed policy of failure to investigate to the constitutional violations he claims to have suffered." *Fountain vs. City of White Plains,* 2015 Westlaw 5602869 at page 9, S.D.N.Y. September 23, 2015. So the Monell claim based on the failure to investigate theory also fails because plaintiff has not advanced a plausible Monell claim under any of the three theories advanced. The Monell claim would be dismissed even if there were a plausible Constitutional violation of which, as I've said, there isn't.

Turning to the conspiracy claim, plaintiff has not plausibly alleged a 1983 violation by the ADAs or the DA and nor can the 1983 claims against them, against the DA's office and the County survive on the theory that the DA's conspired with the YPD officers. Plaintiff alleges that the County, defendants, actions amounted to a conspiracy under Section 1983 in paragraphs 123 to 127. But to state such a claim, a plaintiff has to plausibly allege "an agreement between a state actor and a private party, to act in concert to inflict an

unconstitutional injury, and an overt act done in furtherance of that goal causing damages." *Ciambriello vs. County of Nassau,* 292 F.3d 307 at 324 to -25. "complaints containing only conclusory, vague or general allegations that the defendants have engaged in a conspiracy to deprive a plaintiff of his Constitutional rights are properly dismissed. Diffuse and expansive allegations are insufficient unless amplified by specific instances of misconduct." That's Ciambriello at 325 quoting *Dwares vs. City of New York,* 985 F.2d 94 at 100. Here, plaintiff in those paragraphs had simply pleaded conclusory allegations that defendants were engaged in a conspiracy to deprive him of his Constitutional rights. He's "offered no facts plausibly suggesting a meeting of the minds nor provided any details of time and place. Indeed, the AC does not even identify who allegedly conspired on behalf of the County." *Askew vs. Lindsay,* 2016 Westlaw 4992641 at page 5 note 3, S.D.N.Y. September 16, 2016. Accordingly, the motion to dismiss the conspiracy claim against the County is granted.

As to the state law claims, the defendants argue that if the federal claims are dismissed, I should decline to exercise supplemental jurisdiction over any remaining state law claims. The state law claims that plaintiff asserts are also advanced against nonmoving defendants from Yonkers against whom the claim remains. While the "traditional values of judicial economy, convenience, fairness, and comity" weigh in favor of

declining to exercise supplemental jurisdiction where all federal claims are eliminated before trial, *Kolari vs. New York-Presbyterian Hospital,* 455 F.3d 118 at 122, federal-law claims remain here, albeit against other defendants, and accordingly I decline to dismiss the state law claims on such grounds. But for the same reason the AC does not plausibly allege Section 1983 violations on the part of the ADAs, it also does not plausibly allege false arrest, malicious prosecution or abuse of process claims under state law. And as to the last claim, the allegations are, in any event, entirely conclusory. Further, there are no facts supporting the assault and battery claims versus any county employees. That plaintiff was wrongfully imprisoned as a result of misconduct by the YPD does not suffice to render his jailers liable for assault and battery based just on their being the agency that held him. Absent allegations of any wrongful use of force beyond that ordinarily incident to imprisonment and absent allegations that any Westchester corrections official did anything to wrongfully detain plaintiff, no assault and battery claim lies against Westchester on the basis of plaintiff's incarceration. I don't know why the County did not raise these issues itself, but they are sufficiently obvious that I do so sua sponte. Accordingly, the false arrest, malicious prosecution, abuse of process, and assault and battery claims against the County are dismissed.

Finally, as defendants correctly note, "Under

New York law, public policy bars claims sounding in intentional infliction of emotional distress against a governmental entity." *Green vs. City of Mount Vernon*, 96 F. Supp. 3d 263 at 299 to 300, S.D.N.Y. 2015. Accordingly, the IIED claim against Westchester is also dismissed.

Turning to the punitive damages claim. Punitive damages are not a standalone claim. There being no surviving claims against the County, there is nothing for which to award damages, punitive or otherwise. Further, even if a 1983 claim survived, a municipality is immune from punitive damages under Section 1983. *City of Newport vs. Fact Concerts,* 453 U.S. 247 at 271. And the same is true for state law claims. *Westbrooks vs. City of Buffalo,* 2014 Westlaw 297107 at page 6, W.D.N.Y. January 27, 2014. Accordingly, the motion to dismiss the punitive damages claim against the County is granted.

Now, with respect to leave to amend, Rule 15 says it should be freely given when justice so requires. It's within my discretion whether to grant or deny leave to amend. *McCarthy vs. Dun & Bradstreet,* 482 F.3d 184 at 200. Though liberally granted, leave to amend may properly be denied for things like undue delay, repeated failure to cure by previous amendments, undue prejudice, or futility. *Ruotolo vs. City of New York,* 514 F.3rd 184 at 191.

Plaintiff has already amended his complaint once after having the benefit of a premotion letter from the

defendants outlining the proposed grounds for dismissal and the discussion at the August 24, 2016, premotion conference. Plaintiffs failure to fix deficiencies in the AC after being provided notice of them is alone sufficient ground to deny leave to amend sua sponte. See In re Eaton Vance 380 F. Supp. 2d 222 at 242, S.D.N.Y. 2005, affirmed sub nom. *Bellikoff vs. Eaton Vance,* 481 F.3d 110 at 118 and *Payne vs. Malernathew*, 2011 Westlaw 3043920 at page 5, S.D.N.Y. July 22, 2011.

With respect to plaintiff's information regarding civilian complaints recently received via a FOIL request, I have taken them into account and found the claim is still insufficient. So amendment to add them would be futile.

Further, "contemporaneous or subsequent conduct can't establish a pattern of violations providing notice." Connick at 63, note 7. So any complaints made at the same time or after the events in plaintiff's case occurred would not help show notice.

In addition, plaintiff asserts that he has several outstanding requests for records to the Department of Justice, the DA's office in Yonkers. At this point, however, the claims are not plausible and plaintiff has not identified new facts he could add to make them. So a plaintiff is not allowed to fish for evidence of a pattern through discovery, but instead must set forth making a pattern plausible before the "doors of discovery" are unlocked. Iqbal, 129 S. Court at 1950. I

recognize these requests are FOIA or FOIL requests not discovery requests, but the issue is analogous. At this time, the claim can't go forward. And the plaintiff has not suggested he's in a position to amend or in possession of new facts he could add that would cure the problems identified in this decision. So I decline to grant leave to amend sua sponte. See *TechnoMarine vs. Giftports,* 758 F.3d 493 at 505 to -06 where the circuit said leave to amend may not be given if the plaintiff doesn't specify how amendment would cure the problems; *Gallop vs. Cheney*, 642 F.3d 364 at 369 where dismissal of a claim with prejudice was appropriate in the absence of any indication plaintiff could or would provide additional allegations leading to a different result; see also *Loreley Financial vs. Wells Fargo,* 797 F.3d 160 at 190 where the court said denial of leave to amend would be proper where the "request gives no clue as to how the defects would be cured." So I'm not going to sua sponte grant leave to amend.

So in conclusion, for these reasons, the County defendants' motion to dismiss is granted. The clerk of court is directed to terminate the pending motion and to terminate the Westchester County Department of Corrections, the Westchester County District Attorney's Office, Janet DiFiore and the County of Westchester as defendants. The following claims remain against the Yonkers defendants: Claims I through VI and IX through XII.

Now let's go off the record a moment.

(A discussion was held off the record.)

THE COURT: We've had a discussion off the record. The City is going to consider whether it's interested in an early mediation and the parties are going to confer on a discovery schedule. Let me suggest that you -- before you leave, you get from Ms. Cama one of our blank case management plans so you have something to fill in when we come back at a conference in three or four weeks, at which time we'll discuss both of those matters.

THE DEPUTY CLERK: Friday, July 14, 4:00 p.m.

THE COURT: I don't think we're going to be done with that trial, are we? Oh, wait. July 14. I'm sorry. Never mind. You're right. July 14, 4:00 p.m.

MR. BRAVERMAN: Is there any chance we could go to the following Friday? I actually -- you're on a trial the following Friday?

THE COURT: I start a trial the following Monday.

MR. BRAVERMAN: I wonder if I could have one of my co-counsel stand in with me. Because I may be on trial in state court, starting on the 10th, for about two weeks.

THE COURT: It will just be scheduling.

MR. BRAVERMAN: So somebody else can stand for me?

THE COURT: We can manage without you. I'm going to be busy with the City of Yonkers starting the 17th.

But not Mr. McCormick, right?

MR. BRAVERMAN: I may watch that too. We'll see what happens.

THE COURT: July 14, at 4:00.

MS. COSGRIFF: I just have one housekeeping matter.

With regard to the docket sheet, the individual ADAs and Janet DiFiore are still listed on that docket sheet. I was wondering if Your Honor would issue an order terminating the proceeding -- the case against them, each and every one of them.

THE COURT: Yeah, I didn't realize the individual ADAs had not been terminated. Okay. So let me, in addition to DiFiore, Hochheiser, Cecchini, Woodley -- is Woodley an ADA?

MS. COSGRIFF: Yes.

THE COURT: -- Woodley, Ward, Sapakoff, and Bender should also all be terminated.

MS. COSGRIFF: And Janet DiFiore.

THE COURT: I have already said her. Janet DiFiore was only sued -- oh, she was sued individually as well. So they should be terminated as defendants in their individual and official capacities.

(Proceedings continue - Next page)

Okay. Thank you all.

MS. COSGRIFF: Thanks.

MR. BRAVERMAN: Have a good day.

(Proceeding concluded)

Certified to be a true and accurate transcript of the digital electronic recording to the best of my ability.

_____________________________________

U.S. District Court