SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF WESTCHESTER
------------------------------------------------------------------X
THE PEOPLE OF THE STATE OF NEW YORK

**DECISION AND ORDER**
Indictment No.: 70003-81
(Legacy No.: 81-0857)

-against-

JEFFREY KOONCE,

Defendant.

------------------------------------------------------------------X

McCARTY, J.[1]

Defendant moves, by counseled motion, brought pursuant to CPL §§440.10[1](g) and (h), for an Order vacating his convictions under the within indictment. The People join in this application. Having read the moving papers, affirmation in support, all annexed exhibits and transcripts of the *Wade* hearing and trial, this Court finds that Defendant is entitled to the relief requested for the reasons set forth below.

Defendant was convicted, by jury trial, of *inter alia*, robbery in the first degree and assault in the first degree in connection with an armed robbery, which occurred on June 20, 1981, at the Stars Rod and Gun Club then located at 58 West Sanford Boulevard in Mount Vernon. On July 13, 1983, Defendant was sentenced to an indeterminate term of 7 1/2 to 15 years in state prison. In large part, Defendant was convicted based on a single eyewitness identification.

In the thirty-plus years that have elapsed since Defendant was tried, significant social science research has brought concerns about the reliability of eyewitness identifications to the forefront. In *People v. LeGrand*, decided in 2017, the Court of Appeals recognized the importance, where a case "turns on the accuracy of eyewitness identification[] and there is little or no corroborating evidence connecting the defendant to the crime", of permitting the defense to elicit expert testimony relating to the reliability of eyewitness identifications (8 NY3d 449, 452 [2017]). Expert testimony was neither offered nor admitted in Defendant's trial.

Further, since Defendant was tried under this indictment, model criminal jury instructions have undergone significant modifications in keeping with the social science research relating to eyewitness identification. Where, as here, only one witness has identified an alleged perpetrator, jurors are now specifically informed: "[o] ur system of justice is deeply concerned that no person who is innocent of a crime be convicted of it . . . to avoid that, a jury must consider identification

---

[1] It is disclosed that Judge McCarty was employed by the Office of the Westchester County District Attorney at the time the within matter was prosecuted. Judge McCarty has no personal recollection of the prosecution and, moreover, a review of the People's case file demonstrates that now Judge McCarty was not involved in any manner in the prosecution of this case.

testimony with great care, *especially when the only evidence identifying the defendant as the perpetrator comes from one witness* (CJI 2d, Model Jury Instructions, General Applicability, Identification-One Witness (emphasis added)). The charge continues, in relevant part, with an admonition to the petit jurors that, when considering whether an eyewitness identification is accurate or whether the witness is honestly mistaken, they should consider factors including, but not limited to, the "witness's intelligence, and capacity for observation, reasoning and memory" (*Id.*). Additionally, the present model criminal jury charge specifically and directly informs jurors that: "[a] witness's confidence in the correctness of an identification is not a conclusive indicator of the accuracy of the identification" (*Id.*). Although the trial record reveals that, the jurors adjudicating Defendant's guilt, received expanded instructions concerning how to evaluate the identification testimony of the sole identifying witness, understandably, they did not receive the admonitions addressing the dangers of unreliable witness identifications that are required today nor did they have the benefit of expert testimony relating to the reliability of eyewitness identifications (*see generally*, Trial Transcript; pp. 627-629).

Further, a litany of cases have explicitly acknowledged a clear link between mistaken eyewitness identification and wrongful conviction (*People v. Boone*, 50 NY3d 521, 527 [2017](observing that "mistaken eyewitness identifications [have been found to be] 'the single greatest cause of wrongful convictions in this country' and are 'responsible for more . . . wrongful convictions than all other causes combined'); *People v. Santiago*, 17 NY3d 661, 664 [2011](recognizing that mistaken eyewitness identifications have played a significant role in many wrongful convictions and opining that expert testimony on the subject of eyewitness recognition memory can educate a jury about circumstances under which an eyewitness is more likely to make mistakes). Evidence of the phenomenon-- that eyewitnesses tend to over-estimate the duration of brief incidents they observe-- has also emerged (*People v. Oddone*, 22 NY3d 369, 379 [2013]). Here, the single eyewitness estimated the commission of the crime to have lasted between fifteen (15) and twenty (20) minutes (Trial Testimony, p. 170). In the vast experience of this Court, this estimation appears exaggerated.

In 2009, with the mission of "eradicating systematic and individual harms caused by wrongful convictions . .", the New York State Justice Task Force was convened with the mission to "eradicate the systematic and individual harms caused by wrongful convictions, and to promote public safety by examining the causes of wrongful convictions and recommending reforms to safeguard against any such convictions in the future" (NYS Justice Task Force, Recommendations for Improving Eyewitness Identification, February 2011, p. 1). While recognizing that mistaken identifications can occur based on a host of factors, the Task Force's Identifications Subcommittee concentrated on setting forth best practices to guide law enforcement agencies when conducting identification procedures. These include, *inter alia*, that law enforcement officials explicitly advise witnesses that the perpetrator of the alleged crime may not be included in the photo array or line-up they will view and directly inform them that they should not feel compelled or obligated to make an identification (*Id.*, p. 3).

In significant contrast to the now well settled practices for conducting same, law enforcement presented the 15-year-old sole eyewitness, who admittedly observed Defendant from some feet away, in "fair" lighting conditions, immediately upon being roused from sleep, and after having been shot, was presented with a photographic array while he was convalescing

in a hosp[illegible] The eyewitness testified at a pre-trial *Wade* hearing, that the police directed him to "look carefully at the photographs" and "pick out the guy- that fits the description of the guy you saw in the bar, shot you" (Transcript of the *Wade* Hearing, p. 14 and 123). Further, while the eyewitness remained hospitalized in relation to significant injuries he sustained during the armed robbery, law enforcement conducted a "show up" during which Defendant was presented to the eyewitness. During this procedure, which the Court (Scudder, J.) properly suppressed as unduly suggestive, law enforcement officers directed the eyewitness "to do—to try to identify" despite his having informed them that he was "kind of sick" and "wasn't feeling up to it" (*Id.*, p. 126).

Although the Court (Scudder, J.) properly suppressed these identification procedures as unduly suggestive and capable of inducing an irreparably mistaken identification, at trial, the eyewitness was permitted to identify Defendant as the Court found that "independent source" for such identification had been established (Trial Transcript. p. 190; *see generally, People v. Chipp*, 75 NY2d 327 [1990]). The basis of the "independent source" included observations made by the eyewitness during the commission of the crime inside the fairly-lit pool club, after being roused from sleep by commotion, having an approximately twenty-inch sawed-off shotgun pointed at him, and being shot (*see generally*, Trial Transcript, pp. 156-158).

Under the unique circumstances of this case, after participating in the above discussed suggestive police arranged identification procedures, the eyewitness had occasion to observe Defendant in the confines of his hospital room for the duration of a felony hearing (Transcript of Felony Hearing, p. 3, lines 8-18 and p. 8, lines 4-22). It is impossible to quantify the effect this latter event may have had on the eyewitness' steadfast belief that Defendant committed the charged crimes. Social science research has revealed a phenomenon, explicitly recognized by the Court of Appeals, under which "[a]n eyewitness is often utterly confident about an identification, . . . and hence entirely unshakable on cross-examination" despite the possibility of being mistaken (*see*, *People v. Boone*, 30 NY3d at 531 citing Jules Epstein, *The Great Engine That Couldn't: Science, Mistaken Identifications, and the Limits of Cross-Examination* (Stetson L Rev 727, 772 [2007])). To be clear, this Court is not suggesting that the single eyewitness in this case did not testify truthfully, nor does it discount the possibility that the eyewitness' identification of Defendant was accurate. Nevertheless, chance is not tantamount to proof beyond a reasonable doubt.

In the opinion of this Court, the specter of concern as to the accuracy of the identification of Defendant is further raised by the fact that, of the twenty (20) people estimated to be present in the Stars Rod and Gun Club during the commission of the charged crimes, only the eyewitness identified Defendant. Moreover, from the outset, Defendant has denied his guilt and consistently maintained an alibi defense.[2]

---

[2] With respect to the alibi defense, it is of *de minimus* import that case detectives did not interview some alibi witnesses (*cf.*, Newirth Affirmation, ¶48 and 50). Defendant had a full and fair opportunity to present his alibi at trial and did so through his own testimony as well as that of the co-defendant and two (2) witnesses (*see generally*, Trial Transcript). The suggestion that Det. Salatollo's testimony, given under cross examination, that the police did not credit the alibi defense, "may have had a deleterious effect on the jury's assessment of the alibi witnesses" is based in speculation, discounts the fact that the jurors were in the unique position to hear and evaluate the testimony and credibility of the witnesses, and fails to

While, for the foregoing reasons, this Court finds that Defendant is entitled to the relief sought by the herein motion, it does not credit any claims of police misconduct as all are exclusively the product of conjecture and supposition. While it is certainly true that the case detectives' paperwork was lacking and should have been maintained in a more complete fashion, it does not naturally follow that either Det. Salatollo or Det. Garcia was dishonest in their recitation of the events which lead to the recovery of a "blue tote bag with white handles" similar in appearance to one utilized during the armed robbery from Defendant's apartment (*see*, Trial Testimony, p. 286; *cf.* Newirth Affirmation, ¶¶57-62). So too, the defense's conclusions about Ronald Deighan and its claim that Defendant's trial was "marred by false police testimony" lack factual support and are buttressed merely by speculation (¶¶63-72 and 81-91(despite the heading, none of the enumerated paragraphs references an alleged falsity by a police witness). It bears comment that Ronald Deighan did not testify at trial, was not located in connection with the reinvestigation of this matter, and never disavowed the information Det. Salatollo attributed to him in his testimony (*see*, Newirth Affirmation, ¶¶63-72).

In addition, this Court does not find that the composition of the photographic array shown to the single eyewitness was suppressed from Defendant or that the makeup of the array constitutes "newly discovered evidence" (*cf.*, Newirth Affirmation, ¶124). By definition, "newly discovered evidence" is that which, even with due diligence, could not have been produced at the trial (*see*, *People v. Hartle*, 40 NY3d 38 [2023]). Here, the transcript of the *Wade* hearing conclusively establishes that, during this proceeding, the photographic array at issue was shown to defense counsel and seemingly discussed with Defendant (Transcript of Wade Hearing, pp. 11-12). Further, despite significant criticism levied with respect to how law enforcement composed the photographic array, while arguably imperfect, it consists of individuals, including Defendant, who roughly match the eyewitness' description of the perpetrator as a young black male with short hair and some degree of facial hair (*see*, Transcript of *Wade* Hearing, p. 161; *see also*, Newirth Affirmation, Exhibit 1 and Affirmation in Support, Exhibit 1).

Furthermore, to the extent the moving papers include defalcations committed by Det. Lt. Astorino ("Lt. Astorino"), Lt. Astorino did not participate in any aspect of the police investigation relating to Defendant's commission of the charged crimes. Lt. Astorino's sole connection to the within indictment is his tangential involvement in a line-up proceeding at which the co-defendant was identified (Transcript of *Wade* Hearing, Transcript of *Wade* proceeding, pp. 103-113). Importantly, Lt. Astorino's testimony regarding this event was largely, if not wholly, verified by the civilian witness who viewed the line-up (Transcript of *Wade* Hearing, pp. 33-34, 105-108, and 175-177). Consequently, Det. Lt. Astorino's proven malfeasance with respect to other cases is without bearing upon the herein prosecution.

Similarly, although the moving papers detail wrongdoing in connection with unrelated matters on the part of Det. James Garcia ("Det. Garcia"), Det. Garcia was not present during the

---

appreciate that, even if not said, it is axiomatic that the police did not credit the alibi defense to the extent that Defendant was the subject of the prosecution (*cf.*, Newirth Affirmation, ¶54).

commission of the crime, did not testify at the felony hearing, nor at the *Wade* hearing or Defendant's trial. None of the police-arranged identification procedures that Det. Garcia was involved in executing was introduced at trial. Furthermore, while Det. Garcia was present when the above-discussed blue tote bag with white handles was recovered from Defendant's apartment, he was not the sole witness to this event. Moreover, other than such tote bag, Det. Garcia's investigative efforts did not reveal any evidence which corroborated the sole eyewitness' identification of Defendant. Consequently, his subsequently committed, egregious defalcations lack relevance to the instant motion.

Nevertheless, upon the previously discussed deficiencies of the single eyewitness identification, this Court concurs with the defense and the People that, upon the totality of the unique circumstances presented by this case, as well as the People's present lack of confidence in the integrity of Defendant's conviction, Defendant is entitled to vacatur of the judgements of conviction under the within indictment (*see* generally, CPL §§440.10[g] and [h]).

In addition to joining Defendant's motion for vacatur, the People move to dismiss the instant indictment citing, *inter alia*, the "impact of the passage of time on memory" and, specifically, to a recent interview during which the sole identifying eyewitness recollected that the Stars Rod and Gun Club was "dark" and that he was "covered up" by a number of adults after he was shot. Significantly, the then eyewitness maintains that, at present, he cannot identify any perpetrator of the 1981 armed robbery.

Accordingly, and upon the foregoing, it is hereby

ORDERED, that Defendant's motion to vacate the judgments of conviction under Westchester County indictment number 70003-81 (Legacy No.: 81-0857) is GRANTED; and it is further

ORDERED, that Westchester County indictment number 70003-81 (Legacy No.: 81-0857) is DISMISSED.

The foregoing constitutes the Decision, Order, and Judgment of the Court.

Dated: White Plains, New York
December 23, 2024

HON. JAMES A. McCARTY
Supervising Judge of the Felony Criminal Parts, 9th JD
Hon. J. McCarty